147 F.3d 802
 98 Cal. Daily Op. Serv. 3296, 98 Daily Journal
D.A.R. 4562
Faye GARNEAU, Edward Garneau, Robert Klepinger, Nicolas
Fedan, Richard Ju, Triad Development, Inc., a
Washington corporation, Plaintiffs-Appellants,
v.
CITY OF SEATTLE, a municipal corporation, Defendant-Appellee,
and
The Tenants Union, Defendant-Intervenor-Appellee.
 No. 95-35920.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 6, 1996.
Decided May 4, 1998.
 
 Eric R. Hultman, Seattle, Washington, for appellants.
 Sandra M. Watson, Seattle City Attorney's Office, Seattle, Washington, for appellee.
 Steve Fredrickson, Seattle, Washington, for intervenor-appellee.
 Appeal from the United States District Court for the Western District of Washington Barbara J. Rothstein, Chief Judge, Presiding. D.C. No. CV-94-00914-BJR.
 Before: BRUNETTI and O'SCANNLAIN, Circuit Judges, and WILLIAMS,* District Judge.
 BRUNETTI, Circuit Judge:
 
 
 1
 In this case we are asked to decide whether the enactment of the Tenant Relocation Assistance Ordinance by the City of Seattle effected a taking of property in violation of the Fifth and Fourteenth Amendments.[1]I.
 
 A.
 
 2
 During the 1980s, Seattle area low-income tenants were hurt by a booming redevelopment market that led to a sharp increase in rental prices and a corresponding decrease in the number of rental units affordable to low-income tenants. In 1990, as part of the Growth Management Act, the Washington State Legislature adopted legislation enabling municipal governments to enact relocation assistance provisions. RCW 59.18.440. In relevant part, the enabling legislation authorizes certain local jurisdictions:
 
 
 3
 to require, after reasonable notice to the public and a public hearing, property owners to provide their portion of reasonable relocation assistance to low-income tenants upon the demolition, substantial rehabilitation whether due to code enforcement or any other reason, or change of use of residential property, or upon the removal of use restrictions in an assisted-housing development....
 
 RCW 59.18.440(1)
 
 4
 Through this legislation, the state hoped to encourage economic opportunity for all Washington citizens and to promote the availability of affordable housing as well as to preserve existing housing stocks. Washington Laws, 1990, 1st Ex.Sess., Ch. 17, § 2(4) and (5).
 
 
 5
 In July 1990, the City of Seattle took advantage of the State's enabling legislation by promulgating the Tenant Relocation Assistance Ordinance ("TRAO"), which requires landlords to pay cash relocation assistance to low-income[2] tenants they intend to displace by redeveloping their property. Specifically, the TRAO provides that:
 
 
 6
 Low-income tenants who are displaced by demolition, change of use, substantial rehabilitation, or removal of use restrictions and who comply with the requirements of [the TRAO], shall be paid a relocation assistance payment in the amount of two thousand dollars ($2,000.00)....
 
 
 7
 SMC 22.210.130(A).
 
 
 8
 Under the TRAO, the owner of the dwelling unit:
 
 
 9
 is responsible for payment of one-half (1/2) of the total amount of relocation assistance due to eligible tenants pursuant to [the TRAO]. The City is responsible for payment of the remaining one-half (1/2) of the relocation assistance.
 
 
 10
 SMC 22.210.110(A).
 
 
 11
 Within five days of receiving notice of tenant eligibility, the owner of a dwelling must provide the Director of the Department of Construction and Land Use with the owner's portion of the relocation assistance to be paid to eligible tenants. SMC 22.210.110(B). After eligible tenants are paid the relocation assistance, any money remaining of the owner's deposit is returned "thirty (30) days after final unappealed decisions regarding eligibility of all tenants of the affected units,...." SMC 22.210.130(F).
 
 
 12
 On June 7, 1990, the Seattle City Council held a public hearing on the TRAO. Approximately thirty citizens testified in favor of the ordinance, while no one testified against it. The parties have stipulated to the following summary of testimony given at the June 7, 1990 public hearing:
 
 
 13
 One of the purposes of the hearing was to receive testimony regarding the relocation expenses that displaced tenants might reasonably incur. At the June 7, 1990 public hearing, Karen White, an employee of the Department of Construction and Land Use ("DCLU"), the agency designated to administer the TRAO, testified regarding the results of an informal study she had conducted regarding the average costs of relocating for displaced tenants, using the cost categories provided in RCW 59.18.440. Ms. White called three or four local moving companies to determine the average cost of moving a household from a one-bedroom apartment to some other location in Seattle. She referred to a monthly report published by a local realty company, Cain and Scott, to learn the average rent in Seattle, to use in determining first and last months' rent costs. She also contacted a local real estate analyst who had recently completed a study of the typical amount required for damage and security deposits by local landlords. She also contacted the local utility companies to determine typical connection fees and deposits....
 
 
 14
 Stip. Fact 4.
 
 
 15
 Karen White testified that the various moving costs, on average, totalled $2,191.00. Stip. Fact 4. That amount was based upon: $291 for physical moving costs, $1,000 for first and last month's rent, $200 for damage deposit, $100 for utility connection fees and deposits, and $600 for one year's increased rent of $50 per month. Stip. Fact 4.
 
 B.
 
 16
 Owners of rental units subject to the TRAO[3] brought suit in state court challenging the constitutionality of the TRAO and its enabling legislation. They asserted facial and as-applied takings challenges, and facial and as-applied substantive due process challenges. The City removed the case to federal district court. At the outset of discovery, the City served each plaintiff with a set of interrogatories and requests for production of documents. The City asked plaintiffs to produce information concerning the value of their properties and the projected impact the TRAO would have on the value of each property. Plaintiffs refused to respond to the requests, objecting that the documents were not relevant and that the requests were overly burdensome. In response to the City's motion to compel discovery, plaintiffs brazenly confronted the district court by arguing:
 
 
 17
 Plaintiffs admit they have not attempted to literally comply with [Requests for Production] 1 and 2, or any other discovery request. Rather, plaintiffs view discovery as a process to provide relevant information, not complying with the letter of discovery requests. If the information sought in the discovery requests can be conveyed without answering completely, plaintiffs will do so.
 
 
 18
 On November 21, 1994, the district court granted the City's motion to compel discovery, ordering plaintiffs to produce the discovery forthwith. After plaintiffs ignored the court's order, the City filed a motion for sanctions, seeking dismissal of plaintiffs' as-applied constitutional claims. Hoping to avoid producing the requested discovery, plaintiffs agreed to dismiss their as-applied claims. Plaintiffs' hopes that the discovery requests would finally cease were defeated when the court found that the City's discovery requests were also relevant to plaintiffs' facial takings claim. Thus, even though the as-applied claims were dismissed, the court ordered plaintiffs to comply with the City's discovery requests. When plaintiffs again flaunted the court's order, the court imposed sanctions by prohibiting plaintiffs from introducing at trial or for any other purpose evidence "of the loss of value, the effect on the market value, or the economic impact of the TRAO." The court acknowledged the potentially fatal consequences of its order. "[T]he inability to present evidence of impact on market value or economic impact may greatly hinder or make impossible plaintiffs' ability to maintain a takings claim."
 
 
 19
 Following this episode, the parties filed a "Stipulations of Fact," concerning the City's reasons for promulgating the TRAO, and the effect the TRAO would have on plaintiffs. As noted above, the parties stipulated to the testimony presented at the June 7, 1990 City Council meeting. In addition, the parties stipulated to other facts relevant to the constitutional claims raised on appeal, including:
 
 
 20
 6. The TRAO does not compel any of the plaintiffs to submit to the physical occupation of any of their property.
 
 
 21
 7. The TRAO does not deny any of the plaintiffs of all economically viable use of their property.
 
 
 22
 9. One of the purposes of the TRAO is to protect and financially assist residential tenants, especially low-income tenants, who were being displaced by demolition, change of use, or substantial rehabilitation of their rental units.
 
 
 23
 10. Protecting and assisting residential tenants, especially low-income tenants, who are being displaced by private development is a legitimate public purpose.
 
 
 24
 11. One of the ways in which the TRAO protects and assists low-income tenants subject to displacement ... is to pay each of them $2,000 for the purpose of relocation assistance....
 
 
 25
 16. The TRAO relocation assistance payment may be effective in reducing the costs to owners of evictions and repairs.
 
 
 26
 17. The TRAO did not prevent the named plaintiffs from developing their property.
 
 
 27
 After the close of discovery, the City moved for summary judgment, requesting that the court determine the facial constitutionality of the State and municipal laws.[4] The landowners cross-moved for summary judgment, requesting that the court declare the TRAO unconstitutional. The court granted the City's motion for summary judgment. Rejecting the landowners' facial takings claim, the court found that the TRAO is reasonably related to a legitimate state interest. Garneau, 897 F.Supp. at 1325 (citing Commercial Builders of Northern California v. City of Sacramento, 941 F.2d 872 (9th Cir.1991)). The court employed a nearly identical analysis in rejecting the landowners' facial substantive due process claim. Id. at 1323-24 (citing Kawaoka v. City of Arroyo Grande, 17 F.3d 1227, 1234 (9th Cir.1994)). The landowners appeal the court's denial of their facial takings claim.[5] They also appeal the court's discovery orders compelling them to produce financial documents and subsequently sanctioning them for failure to produce the documents.
 
 II.
 
 28
 Plaintiffs argue that the "unconstitutional exactions" cases provide the appropriate standard for reviewing the TRAO. See Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). They argue that we must invalidate the TRAO if we determine that the $1,000 per low-income tenant exaction is not roughly proportional to the harm caused by their proposed development. For reasons discussed in the next section, we conclude that these cases provide no support for plaintiffs' claim. Instead, we find the more traditional regulatory takings analysis of Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) applicable. Applying Agins, we conclude that plaintiffs have failed to provide evidence relevant to their claim, and we affirm the district court's summary judgment in favor of the City.
 
 A.
 
 29
 Government regulation of private property violates the Takings Clause[6] if it fails to substantially advance legitimate state interests. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1016, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); Agins, 447 U.S. at 260, 100 S.Ct. 2138. Governmental regulation categorically violates the Takings Clause if it results in the physical invasion of property, or if it denies the owner all economically viable use of his property. Lucas, 505 U.S. at 1015, 112 S.Ct. 2886. Generally in these cases, no matter how minute the physical invasion, and no matter how important the public purpose behind the governmental action, just compensation will be required. Id. at 1015-16, 112 S.Ct. 2886.
 
 
 30
 By contrast, in non-categorical regulatory takings cases, the court must engage in an ad hoc, factual inquiry to determine whether the government regulation goes too far. Id. at 1015, 112 S.Ct. 2886; see also Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ("The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."). Although this inquiry may focus on several factors, the Court has repeatedly recognized two as "keenly relevant." Id. at 1019 n. 8, 43 S.Ct. 158. First, is "the economic impact of the regulation on the claimant"; second, is "the extent to which the regulation has interfered with distinct investment-backed expectations." Id. (citing Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)); see also Hodel v. Irving, 481 U.S. 704, 715, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987) (finding that Native Americans did not have reasonable investment-backed expectations in devise and descent of property); MacDonald, Sommer & Frates v. County of Yolo, 477 U.S. 340, 349, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986) (factors to be considered are economic impact of regulation, its interference with reasonable investment-backed expectations, and the character of the governmental actions); Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 191, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (same); Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (same); Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (same).
 
 
 31
 In facial takings claims, the inquiry is further limited to whether "mere enactment" of the regulation has gone too far. See Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725, ---- n. 10, 117 S.Ct. 1659, 1666 n. 10, 137 L.Ed.2d 980 (1997). Indeed, the Court recognized that facial takings challenges "face an uphill battle since it is difficult to demonstrate that mere enactment of a piece of legislation deprived the owner of economically viable use of his property." Id. (internal citations and punctuation omitted). In a facial challenge, a court will look only to the regulation's "general scope and dominant features ... leaving other [specific] provisions to be dealt with as cases arise directly involving them." Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 397, 47 S.Ct. 114, 71 L.Ed. 303 (1926).
 
 B.
 
 32
 The record firmly supports the district court's grant of summary judgment in favor of the City on plaintiffs' facial takings claim. Plaintiffs bear the burden of proving their facial takings claim at trial. See Suitum, 117 S.Ct. at 1666 n. 10; Lucas, 505 U.S. at 1016 n. 6, 112 S.Ct. 2886. Summary judgment is therefore appropriate if the City has pointed out that there is an absence of evidence to support plaintiffs' claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 
 
 33
 Plaintiffs have stipulated that the TRAO neither physically invades their property, nor denies them all economically viable use of their property. Accordingly, we must engage in the ad hoc, factual inquiry appropriate in non-categorical regulatory takings cases. See Lucas, 505 U.S. at 1015, 112 S.Ct. 2886. As noted above, plaintiffs must show that the TRAO "goes too far" in regulating their property by introducing evidence of the economic impact of the enactment of the TRAO on their property. Thus, plaintiffs must show that the value of their property diminished as a consequence of the TRAO. Further, plaintiffs must show that the diminution in value is so severe that the TRAO has essentially appropriated their property for public use.
 
 
 34
 Not only have plaintiffs failed to show the type of "extreme circumstances" necessary to sustain a regulatory takings claim, see United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 126, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), plaintiffs have refused to produce any evidence of economic impact. Plaintiffs refused to produce evidence regarding the value of their property before enactment of the TRAO. They have refused to produce evidence regarding the value of their property after enactment of the TRAO. They have refused to produce evidence regarding the anticipated economic consequences of the TRAO. Plaintiffs have not generally alleged that the TRAO makes it commercially impracticable for them to continue operating their apartment buildings. See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 495-96, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). Indeed, not a single member of the plaintiff class has pointed to a single apartment building that can no longer be operated for profit. Id. at 496, 107 S.Ct. 1232. Furthermore, as a consequence for their refusals, the district court prohibited plaintiffs from introducing any of this evidence "at trial or ... for any purpose whatsoever."
 
 
 35
 There is very little in the record in this case from which we may determine the economic impact of the TRAO on plaintiffs' property. What little evidence there is relates only to an as-applied, not a facial claim. For example, on the value-loss side of the ledger, plaintiffs have asserted that, collectively, members of the plaintiff class have been required to pay almost $80,000 in relocation assistance under the TRAO. Although they have provided no documentation in support of these claims, plaintiffs assert that the Garneaus paid $6,000, Klepinger paid $2,000, Fedan paid $1,000, Ju paid $8,187.96, and Triad paid $59,850. In their complaint, plaintiffs also agree that the City refunded $11,000 to Triad. Thus, in order to get their development permits, plaintiff class members suffered approximately $70,000 in out of pocket expenses.
 
 
 36
 On the other side of the ledger, plaintiffs have stipulated that the TRAO "may be effective in reducing the costs to owners of evictions and repairs." Stip. Fact 16. This is so because the TRAO includes a valuable quid pro quo. In exchange for paying money to the displaced tenants, developers are protected from liability and litigation costs they might incur under Seattle's Just Cause Eviction Ordinance. See SMC 22.206.160(C). Prior to enactment of the TRAO, Seattle tenants could only be evicted for "just or good cause." This protection is not waivable by the landlord or the tenant. By seeking a permit to develop their property under the TRAO, landlords can avoid litigation over the displacement of low-income tenants. Although plaintiffs have stipulated that the TRAO may benefit them by reducing the cost of evictions, they offer no evidence indicating the amount of that benefit. None of the evidence on either side of the ledger goes very far in determining the economic impact the TRAO's enactment had on plaintiffs' property.
 
 
 37
 Plaintiffs have not met their burden of providing evidence that the enactment of the TRAO effected a taking or harmed them at all. We find the absence of any evidence of the economic impact of the TRAO dispositive. On the evidence presented to the district court, no rational jury could have found in favor of plaintiffs on their facial takings claim. Accordingly, we affirm the judgment of the district court.
 
 III.
 
 38
 In rejecting plaintiffs' facial takings claim, we conclude that the Supreme Court's "unconstitutional exactions" cases provide no support for plaintiffs' claim. See Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). Plaintiffs argue that evidence of the TRAO's economic impact is irrelevant under Nollan and Dolan. They argue that where the government demands an exaction in exchange for a permit, all that is relevant is whether the exaction is "roughly proportional" to the harms caused by the proposed development. We first review the Court's analytical framework in the unconstitutional exactions cases, and then conclude that the analysis does not support plaintiffs' facial takings claim in this case.
 
 A.
 
 39
 In Nollan and Dolan, the government used its regulatory power over land use to force an exaction from a permit applicant. In Nollan, the California Coastal Commission forced a couple seeking a building permit to give the public an easement over their beachfront property. 483 U.S. at 831, 107 S.Ct. 3141. In Dolan, the City of Tigard forced a store owner to dedicate a strip of his land for public use. 512 U.S. at 384, 114 S.Ct. 2309. In both cases the Supreme Court found the government's use of its police power illegitimate. Stripped of its legitimacy, government imposition of the exactions were found to constitute takings in violation of the Fifth and Fourteenth Amendments.
 
 
 40
 Read together, Nollan and Dolan establish a three-part test. First the court asks whether government imposition of the exaction would constitute a taking. Second is the "essential nexus" test, which asks whether the government has a legitimate purpose in demanding the exaction. Third is the "rough proportionality" test, which asks whether the exaction demanded is roughly proportional to the government's legitimate interests.
 
 1.
 
 41
 The first inquiry ignores the government's land use power, and asks only whether government imposition of the exaction would be a taking. The exaction is the concession sought by the government, or the condition upon which granting the permit depends. The government may seek land, money, or other concessions in return for the permit. Governments use exactions to mitigate the harms associated with the proposed development. In Nollan, the Court addressed this first inquiry by explaining:
 
 
 42
 Had California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, we have no doubt there would have been a taking.
 
 
 43
 483 U.S. at 831, 107 S.Ct. 3141. The Nollans wanted permission to rebuild their bungalow, and the government demanded a public easement across their beach in return. This first inquiry focuses only upon the government's demand for a public easement. The question thus becomes, "Does the government's demand for a public easement effect a 'taking'?" Because the answer was "yes," the Nollan Court proceeded to the second inquiry. If the answer had been "no," the inquiry would end.
 
 
 44
 The Court began with this step in Dolan as well. 512 U.S. at 384, 114 S.Ct. 2309. Dolan wanted to expand her electric supply store located on Main Street, while the government wanted to turn a strip of her land into a greenway. As it had done in Nollan, the Court in Dolan explained that, "[w]ithout question, had the city simply required petitioner to dedicate a strip of land along Fanno Creek for public use, rather than conditioning the grant of her permit to redevelop her property on such a dedication, a taking would have occurred." Id.
 
 
 45
 The Court had no trouble in either case finding that government imposition of the exaction would amount to a taking. In both cases the government demanded permanent physical occupation of some portion of the applicant's land. Courts have generally found that where government action leads to the physical invasion of private property, it constitutes a per se taking. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 433, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); Levald v. City of Palm Desert, 998 F.2d 680, 684 (9th Cir.1993). Similarly, if the government action denies the owner of all economically viable use of his property, it is also a per se taking. See Lucas, 505 U.S. at 1015, 112 S.Ct. 2886. By contrast, in non-categorical takings cases, courts must undertake "complex factual assessments of the purposes and economic effects of government actions." Yee v. City of Escondido, 503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). Because of the difference in the Court's approach, "much turns on the classification of the government's action." Levald, Inc. v. City of Palm Desert, 998 F.2d 680, 685 (9th Cir.1993).
 
 2.
 
 46
 The second and third inquiries seek to determine whether the government may shield itself from a takings claim through the use of its police powers. In Nollan, the Court framed the second question by asking: "Given, then, that requiring uncompensated conveyance of the easement outright would violate the Fourteenth Amendment, the question becomes whether requiring it to be conveyed as a condition for issuing a land-use permit alters the outcome." 483 U.S. at 834, 107 S.Ct. 3141. This "essential nexus test" compares the government's purpose in seeking the concession with its legitimate land use interests. If the government's purposes are not connected, then the government's demand for the exaction is not a legitimate exercise of its police power, but "an out-and-out plan of extortion." Id. at 837, 107 S.Ct. 3141.
 
 
 47
 Where the government may legitimately use its power to block development, however, "it would be strange to conclude that providing the owner an alternative to that prohibition which accomplishes the same purpose is not a taking." Id. at 836-37, 107 S.Ct. 3141. In Nollan, the government's stated purpose for demanding the beachfront easement was to protect views of the beach from the street. The Court held that giving the public the right to walk along the Nollan's beachfront property was completely unrelated to the public views of the beach from the street. Since the government's demand was unrelated to its legitimate interest, the Court found that there was no essential nexus.
 
 
 48
 The Court reached the opposite conclusion in Dolan. The City of Tigard's interest in the dedicated strip of land was to provide more porous surface in the city to help flood control. The Court found that the exaction was directly related to the government's concern because the strip of land could be used by the City for flood control purposes. Thus, in Dolan, the government passed the essential nexus test.
 
 3.
 
 49
 The third inquiry is simply a refinement of the second. In Nollan the Court explained that the exaction must be related to the burdens imposed by the development. Left open, however, was "how close a 'fit' between the condition and the burden is required." Id. at 838, 107 S.Ct. 3141. The Court answered this question by announcing the "rough proportionality" test. Dolan, 512 U.S. at 391, 114 S.Ct. 2309. In determining this federal constitutional standard, the Court looked to the experience of the state courts.
 
 
 50
 We think the 'reasonable relationship' test adopted by a majority of the state courts is closer to the federal constitutional norm than either of those previously discussed. But we do not adopt it as such, partly because the term 'reasonable relationship' seems confusingly similar to the term 'rational basis' which describes the minimal level of scrutiny under the Equal Protection Clause of the Fourteenth Amendment. No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development.
 
 
 51
 Id.
 
 
 52
 The Court found that the City of Tigard's exaction was not roughly proportional to its flood control interests because the City could have accomplished the same goal with a less invasive measure. For example, the City could have required Dolan to maintain part of her property as a greenway, but kept it private for her customers. "The difference to [Dolan], of course, is the loss of her ability to exclude others. As we have noted, this right to exclude others is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' " Id. at 393, 114 S.Ct. 2309 (citing Kaiser Aetna, 444 U.S. at 176, 100 S.Ct. 383). The rough proportionality test ensures that the "price" of the government permit is not significantly higher than the social harm caused by the proposed development.
 
 
 53
 In footnote eight of its Dolan opinion, the Court added one more twist to this test. See id. at 391 n. 8, 114 S.Ct. 2309. The Court recognized that "in most generally applicable zoning regulations, the burden properly rests on the party challenging the regulation to prove that it constitutes an arbitrary regulation of property rights." Id. The Court explained that the burden shifts to the government, however, where the government makes an "adjudicative decision to condition [an] application for a building permit on an individual parcel." Id. The rationale for this burden shifting appears to rest on the Court's concern that where the government demands individual parcels of land through adjudicative, rather than legislative, decision making, there is a heightened risk of extortionate behavior by the government. See Nollan, 483 U.S. at 837, 107 S.Ct. 3141; see also Ehrlich v. City of Culver City, 12 Cal.4th 854, 50 Cal.Rptr.2d 242, 257, 911 P.2d 429, 444, cert. denied, --- U.S. ----, 117 S.Ct. 299, 136 L.Ed.2d 218 (1996); id., 50 Cal.Rptr.2d at 272, 911 P.2d at 272 at 459 (Mosk, J., concurring) (noting that at ad hoc decision making aimed at individuals increases risk of extortionate government behavior).
 
 B.
 
 54
 The scope of Dolan 's rough proportionality test in takings cases is in considerable doubt. For example, the Supreme Court has left unsettled the question whether Dolan 's rough proportionality test applies to legislative, as opposed to administrative exactions.[7] Lower courts and commentators have also struggled to determine whether the test applies to fee exactions, as opposed to physical exactions.[8] In this case, however, we find Dolan inapplicable for two different reasons. First, we conclude that Dolan applies only to as-applied takings challenges, not to facial takings challenges. Second, Dolan does not address when a taking has occurred, instead, it addresses only how close a fit the exaction (which would otherwise constitute a taking) must have to the harms caused by development. Thus, for the important question in this case whether the TRAO effects a taking, Dolan simply does not address the issue.
 
 1.
 
 55
 The Dolan analysis cannot be applied in facial takings claims. "A facial challenge involves a claim that the mere enactment of a statute constitutes a taking, while an as-applied challenge involves a claim that the particular impact of a government action on a specific piece of property requires the payment of just compensation." Carson Harbor Village, Ltd. v. City of Carson, 37 F.3d 468, 473-74 (9th Cir.1994). In Dolan, the Court analyzed whether the government's exaction was too costly. However, in a facial claim, the court does not analyze the exaction at all. Rather, the court looks to whether the enactment of the ordinance, under which exactions will be imposed, effects a taking. An example of a successful facial claim is Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), where government regulation prohibited all beneficial use of Lucas' beachfront property, for which he had paid $975,000. The Court found that mere enactment of this use restriction rendered Lucas' property "valueless."
 
 
 56
 If this were an as-applied challenge, we would determine the TRAO's effect on each parcel of land. For example in this case, Triad claims to have paid $50,000 in relocation assistance under the TRAO. At the other end, Fedan paid only $1,000 for a permit. Each as-applied regulatory takings claim must be evaluated independently to determine whether the total exaction is roughly proportional to the harm caused by each development. Because in a facial claim we do not analyze the exactions, Dolan 's test for when the exaction costs too much does not apply.2.
 
 
 57
 A second reason why Nollan and Dolan provide no support for plaintiffs' takings claim, is that they do not address when a taking occurs. The first step in the unconstitutional exactions cases is to determine whether government imposition of the exaction would be a taking. Because Nollan and Dolan both involved physical invasions of private property, the Court found the exactions were per se takings. Assuming these cases apply outside the context of physical invasions, a plaintiff still must show in the first step that government imposition of the exaction would constitute a taking. If plaintiffs' claim were an as-applied challenge, each plaintiff would be required to show that the exaction applied to them constituted a taking of their property. If the court determined that imposition of a $1,000 per tenant fee constituted a taking, it would then ask whether requiring the fee as a condition for issuing a land-use permit alters the outcome. See Nollan, 483 U.S. at 834, 107 S.Ct. 3141. Neither Nollan nor Dolan provide a court with any guidance to determine whether imposition of a $1,000 per tenant fee constitutes a taking. It is this first step in the analysis that plaintiffs have entirely ignored in litigating this case.
 
 IV.
 
 58
 We now turn to the district court's discovery rulings. Specifically, plaintiffs challenge two of the district court's orders. First, plaintiffs challenge the court's order compelling them to produce evidence relating to the economic impact of the TRAO. Second, plaintiffs challenge the court's dismissal of their as-applied takings claims as a sanction for their failure to produce discovery. We review the district court's discovery rulings for an abuse of discretion. See Sopcak v. Northern Mountain Helicopter Serv., 52 F.3d 817, 818 (9th Cir.1995).
 
 A.
 
 59
 On appeal, plaintiffs argue that the district court abused its discretion because the information sought by the City was not relevant to any of its claims.[9] Relevance for purposes of discovery is defined very broadly. See Hickman v. Taylor, 329 U.S. 495, 506-507, 67 S.Ct. 385, 91 L.Ed. 451 (1947) ("Information is relevant to the subject matter if it might reasonably assist a party in evaluating the case, preparing for trial or facilitating settlement."). The district court determined that the propounded discovery was relevant to plaintiffs' facial and as-applied takings and substantive due process claims. The relevance of the economic impact of a government regulation challenged under the Takings Clause has been recognized since Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (Holmes, J.). See supra Section II. The district court did not abuse its discretion by ordering plaintiffs to produce evidence regarding the economic impact of the TRAO.
 
 B.
 
 60
 Plaintiffs also appeal the district court's dismissal of their as-applied claims as a sanction for their violation of the court's order. The district court found that plaintiffs agreed to the dismissal of their as-applied claim as a sanction for their refusal to produce discovery. In a letter to the district court, plaintiffs' counsel explained their unwillingness to comply with the court's order:
 
 
 61
 Plaintiffs will not comply with the court's order. Plaintiffs urge the court to enter an appealable order so that this dispute can be heard by the 9th Circuit.
 
 
 62
 Plaintiffs believe it would be futile to comply with the court's order regarding discovery. As long as the court believes the disputed discovery sought by the City regarding the economic impact of the TRAO on these particular plaintiffs is relevant to the TRAO's constitutionality, there is little chance the court will find it results in a taking or a violation of substantive due process.
 
 
 63
 The legal issues regarding what is relevant in determining the constitutionality of the TRAO will ultimately be decided by the appellate courts. It is best to get to that forum sooner rather than later. Plaintiffs wish the court would rule in their favor on these issues. The next best alternative is an order dismissing plaintiffs' case as a sanction, which plaintiffs can appeal to the 9th Circuit.
 
 
 64
 This letter shows that plaintiffs willfully refused to follow the district court's order. It further shows that so long as the court continued to find the requested discovery relevant, plaintiffs preferred to have their as-applied claims dismissed. We conclude that the district court did not abuse its discretion in finding that plaintiffs agreed to dismissal of their as-applied claims as a sanction.
 
 CONCLUSION
 
 65
 We affirm the district court's grant of summary judgment thereby upholding the validity of the TRAO. We have been forced to uphold Seattle's relocation assistance ordinance in large part because of the way plaintiffs have chosen to litigate this case. We do not uphold the ordinance because we find it a wise solution to a difficult problem. Instead, we uphold it because the economic impact of the ordinance is relevant to plaintiffs' takings claim, and plaintiffs have steadfastly refused to produce any evidence of the TRAO's impact. Plaintiffs have litigated this case with a belief that Dolan may be used to strike down any attempt by the City to make them pay for problems they do not believe they created. As we have explained, more is necessary.
 
 
 66
 AFFIRMED.
 
 
 67
 O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part.
 
 
 68
 I join Part IV of the court's opinion regarding the district court's discovery rulings. As to Parts II and III, however, which discuss the constitutionality of the Tenant Relocation Assistance Ordinance ("TRAO"), I respectfully dissent.
 
 
 69
 * Nollan v. California Coastal Commission, 483 U.S. 825, 831-37, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), and Dolan v. City of Tigard, 512 U.S. 374, 386-91, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), outline the steps a court should take in determining the constitutionality of a government's exaction of private property made in exchange for a development permit. In essence, the exaction is unconstitutional when it (a) would be an outright taking in the absence of any exchange for the development permit, and (b) is not "roughly proportional" to the harms caused by the proposed development. Regrettably, the court finds Nollan and Dolan to be inapplicable for two reasons, which I shall address in turn.
 
 
 70
 * The court first concludes that Nollan and Dolan pertain only to as-applied takings challenges, not to facial takings challenges. The analysis goes as follows: (1) the Nollan "nexus" test and the Dolan "rough proportionality" test require a court to compare the government's demanded exaction with the expected harm of the landlord's proposed development; (2) before making this comparison, a court must calculate the total amount of the exaction to be levied against the landlord bringing the suit; (3) in facial challenges, courts do not look at the total actual amount of the exaction, but rather only at the ordinance which permits the exaction; (4) consequently, Nollan and Dolan are not applicable to facial challenges. The weak link in this logical chain is the second step. The court incorrectly assumes that no comparison between exaction and harm can ever be made without first determining the total actual amount of the exaction. What the court disregards is this: When the harm is zero, an exaction can never be roughly proportional to, or even have a nexus with, the harm. Irrespective of the total actual amount of the exaction--whether it be $1,000 or $50,000--it is not roughly proportional to zero. For this reason, I must part company with my colleagues.
 
 
 71
 The proposed development in this case causes no discernible harm whatsoever. When the city claims that the development would cause the tenants' moving expenses, the city is patently incorrect. Whether or not a landlord develops his land, the tenants must bear moving expenses when they vacate the premises. This burden should come as no surprise to tenants, who, by definition, are legally obliged to move out eventually, perhaps involuntarily. In its conventional sense, a "tenant" is "one who has the temporary use and occupation of real property" owned by someone else. Black's Law Dictionary 1314 (1979) (emphasis added). A landlord retains a right to evict the tenant at the expiration of the lease.[1] In constitutional parlance, this right is known as the "right to exclude," which, the Supreme Court has explained, is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." Kaiser Aetna v. United States, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). It is the landlord's exercise of his constitutionally protected right--and not the subsequent development--that causes the tenant's moving expenses. If the landlord chooses not to renew a lease, the tenants must pay moving expenses, regardless of what the landlord does to his land after eviction.
 
 
 72
 Moreover, even were I to accept the city's argument that the proposed development could constitute the cause of the tenant's moving expenses, I would still have to conclude that this "harm" is facially not roughly proportional to the requested exaction. Put simply, the magnitude of the relocation payments under the TRAO bears no relation whatsoever to the tenants' actual or even expected moving costs. Estimated moving costs should not include first or last month's rent, future rent increases, security deposits, or utility deposits because these amounts are not marginal costs. There is little reason to expect these amounts to be greater, on average, as a result of the proposed development.[2] Because only $391 of the relocation expenses is attributable to marginal costs,[3] the landlords' $1,000 share of each payment is assuredly not "related both in nature and extent to the impact of the proposed development." Dolan, 512 U.S. at 391, 114 S.Ct. 2309. Whether the landlord has to pay relocation expenses for one tenant or fifty, the monetary exaction is not roughly proportional to the costs of moving.
 
 
 73
 Thus, I cannot agree with the court's first conclusion that Nollan and Dolan pertain only to as-applied takings challenges. Although the court is correct that the government may seek land, money, or other concessions in return for a building permit, the exactions in this case are impermissible because they are not roughly proportional to the harm caused by the landlords, regardless of the total amount of the exactions. There is no need to determine how many relocation payments the landlords would have to make.
 
 B
 
 74
 The court's second reason for holding Nollan and Dolan inapplicable is that these cases "do[ ] not address when a taking has occurred, [but] only how close a fit the exaction ... must have to the harms caused by development." Maj. Op. at 811. The first step in the Nollan-Dolan analysis, as the court notes, is to determine whether a government exaction would be a taking if made outright, in the absence of any exchange for a development permit. The court apparently believes that, because Nollan and Dolan do not articulate when an outright exaction can constitute a "taking," there could not be a taking under the facts of the present case.[4]
 
 
 75
 * The problem with the court's analysis, quite simply, is that the court's conclusion does not follow from its premise. The question before us is whether a monetary exaction can constitute a taking. Nollan and Dolan 's silence on this question does not imply that the question should be answered in the negative; it merely indicates that the question was not before the Court in either case. Moreover, the Supreme Court has, on other occasions, given us sufficient indication that the monetary exactions authorized by the TRAO are indeed takings. See Ehrlich v. City of Culver City, 512 U.S. 1231, 1231, 114 S.Ct. 2731, 129 L.Ed.2d 854 (1994); Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 163, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980).
 
 
 76
 * First, after deciding Dolan, the Supreme Court granted certiorari and summarily vacated a takings decision of the California Court of Appeal, remanding for consideration in light of Dolan. See Ehrlich v. City of Culver City, 512 U.S. 1231, 114 S.Ct. 2731, 129 L.Ed.2d 854 (1994). Ehrlich involved a fee charged by the city (to pay for more city parks) in exchange for a building permit. If Dolan were not applicable to monetary exactions, as my colleagues suggest, then it would have been an unnecessary waste of judicial resources to vacate and to remand Ehrlich. The Supreme Court's action suggests that the Court would apply Dolan to the monetary exactions at issue today.[5]
 
 
 77
 b
 
 
 78
 Second, in Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), the Supreme Court found a Takings Clause violation in a monetary exaction that was "a forced contribution to general governmental revenues, ... not reasonably related to the costs of [any government service]." Id. at 163, 101 S.Ct. 446. If the exaction had been a "user fee"--a price for particular government services--then it quite likely would have been constitutional. See United States v. Sperry Corp., 493 U.S. 52, 60, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). Indeed, to pass Takings Clause scrutiny, a user fee need only be a "fair approximation of the cost of [government] benefits supplied." Id. (quoting Massachusetts v. United States, 435 U.S. 444, 463, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978)) (internal quotation marks omitted). The exaction in Webb's, however, was not a user fee; rather, it was nothing more than an uncompensated transformation of private property to public property in an attempt to "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Webb's, 449 U.S. at 163, 101 S.Ct. 446 (quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)) (internal quotation marks omitted). Consequently, the exaction at issue in Webb's was unconstitutional.
 
 
 79
 For the same reason, the forced relocation payments at issue today also violate the Takings Clause. The landlords do not receive any government service in exchange for the exaction. The city of Seattle does not even contend that they do. Because the TRAO is not a "user fee," but rather a device for compelling landlords to bear a public burden, the TRAO cannot pass constitutional muster.
 
 2
 
 80
 Moreover, even were I to accept the court's unsubstantiated assumption that ordinary monetary exactions cannot constitute takings, I would still have to disagree with its conclusion that the unique exactions authorized by the TRAO are not takings. The TRAO does not merely exact money.[6] Quite the contrary, a TRAO exaction is tantamount to a physical occupation of land because it has the effect of depriving landowners--without just compensation--of their constitutional right to exclude.
 
 
 81
 * The TRAO is the economic equivalent of a hypothetical statute that
 
 
 82
 (a)"takes" the landowner's right to exclude; and
 
 
 83
 (b) inadequately "compensates" the landowner by granting him the option to buy back the right to exclude, an option whose value is necessarily less than the value of the right to exclude.
 
 
 84
 This hypothetical law has precisely the same effect as the TRAO: the landowner has to pay money to retain his right to exclude.[7] Because the two laws are functional equivalents, the constitutionality of the TRAO should follow the constitutionality of the hypothetical statute. Otherwise, we would be valuing form over function. Hence, if an out-and-out deprivation (without just compensation) of a landowner's right to exclude tenants violates the Takings Clause, then so should the Seattle ordinance.
 
 
 85
 b
 
 
 86
 A deprivation of the right to exclude most certainly violates the Takings Clause, as it constitutes a physical occupation of land. In Yee v. City of Escondido, 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), the Supreme Court made clear, albeit in dictum, that a deprivation of a landowner's right to exclude tenants, in the absence of just compensation, is unconstitutional: "Had the city required [landlords to permit] such an occupation, of course, the petitioners would have a right to compensation...."[8] Id. at 532, 112 S.Ct. 1522. Because a taking of the right to exclude without payment of just compensation is a violation of the Takings Clause, and because the TRAO accomplishes as much, I would hold that the ordinance constitutes an unconstitutional taking.[9]
 
 II
 
 87
 To paraphrase the Supreme Court, the government may not obtain by extortion that which it cannot legitimately take outright. See Nollan, 483 U.S. at 837, 107 S.Ct. 3141. Because I view the Tenant Relocation Assistance Ordinance as akin to extortion, violative of the Takings Clause, I respectfully dissent.
 
 
 88
 SPENCER WILLIAMS, District Judge, concurring.
 
 
 89
 I concur in the result but wish to set forth my reasoning separately.
 
 
 90
 * The Tenant Relocation Assistance Ordinance ("TRAO") and its enabling legislation, RCW 59.18.440, like thousands of other ordinances and statutes imposing fees and penalties, call for the payment of money, not the dedication of "property" for which just compensation can logically be paid. The lack of a just compensation remedy should activate the jurisprudential alarms and warn us that appellants' claim falls not within the confines of the Fifth Amendment, which prevents governments from taking property without just compensation, but within the scope of the Fourteenth Amendment, which prevents states from taking property without due process of law.
 
 
 91
 The just compensation clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation."[1] The plain language of this clause guarantees property owners a monetary remedy in the event the government wishes to use their property for some public purpose. With the exception of the public purpose requirement, the clause omits any language relating to a substantive limit on government action. As the Supreme Court has expressly recognized, the takings clause is not designed to "limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). This Circuit, too, has recognized that the clause does not prevent a government from appropriating private property. Bay View, Inc. v. AHTNA, Inc., 105 F.3d 1281, 1284 (9th Cir.1997); Macri v. King County, 126 F.3d 1125, 1129 (9th Cir.1997). The clause is only offended when it takes private property for a public purpose without paying just compensation. Bay View, 105 F.3d at 1284-85; Macri v. King County, 126 F.3d at 1129; see also Rose Acre Farms, Inc. v. Madigan, 956 F.2d 670, 673 (7th Cir.1992) ("[T]he takings clause does not forbid takings; it requires compensation for takings."). Moreover, this Circuit has recognized that, while "a takings violation is not complete until the plaintiff has sought compensation through state remedies and been denied," that "a substantive due process violation is complete as soon as the government action occurs."[2] Macri, 126 F.3d at 1129. In short, I believe that appellants are attempting to confer on their substantive due process claim a special status by characterizing it as a Fifth Amendment just compensation claim.[3]
 
 
 92
 Allow me to explain further. In light of the remedial nature of the just compensation clause, takings principles cannot logically apply to a case where, as here, the property owners challenge a government action not on the grounds that the government has denied them just compensation, but on the grounds that the government has acted ultra vires by enacting legislation that is inherently wrongful and unfair. Appellants do not seek, nor can they seek, just compensation for government interference which, in the words of First English, is "otherwise proper."[4] In fact, appellants' prayer for relief, which seeks a declaration of invalidity, an injunction, and a refund of monies paid, omits any mention of just compensation. A refund would de facto invalidate the ordinance; it cannot logically equate to "just compensation" for government action which is "otherwise proper" as contemplated by the Fifth Amendment.[5]
 
 
 93
 Appellants' status as owners of real property should not divert our attention from the bedrock fact that the TRAO does not "take" any property. The TRAO does not, as in the classic takings circumstance, involve a government action that results in the occupation or confiscation of private physical property. See, e.g., Pumpelly v. Green Bay and Mississippi Canal Co., 13 Wall. 166, 80 U.S. 166, 20 L.Ed. 557 (1871) (government-authorized dam flooded private property); Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (New York law forced landlords to permit cable television operators to affix cabling to their apartment buildings); Nollan v. California Coastal Commission, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (public commission conditioned building permit on the dedication of a beachfront easement); Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)(local government conditioned building permit on transfer of interest in owner's creekside land); Parks v. Watson, 716 F.2d 646 (9th Cir.1983) (city required that property owner dedicate its geothermal wells in exchange for vacation of platted streets). Nor does it impair any intangible interests in property. See, e.g., Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)(trade secrets); Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (materialman's lien); Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935) (real estate lien). Finally, the TRAO is not a general regulation restricting the use or development of real property. See, e.g., Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922)(state law prohibited mining of certain pillars of coal in order to prevent surface subsidence); Penn Central Transportation Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)(historical preservation ordinance prevented development of an office tower atop Grand Central Station); Keystone Bituminous Coal Ass'n. v. DeBenedictis, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987)(state antisubsidence law prevented owners of coal deposits from removing pillars of coal in certain locations); Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (zoning ordinance prevented landowners from developing more than five dwelling units on their land); Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (regulation prohibited construction on owner's beachfront parcel).
 
 
 94
 Appellants have not put forward any argument that the TRAO dispossesses them of any property, whether tangible or intangible, or that it impairs the development potential or value of their properties. They simply argue that the TRAO unfairly singles them out to shoulder a fiscal burden that should instead be borne by the general public as a whole. Even if appellants had asserted that the relocation assistance provisions led to the devaluation of their apartment buildings, it is well settled that mere diminution in value, standing alone, does not establish an unconstitutional taking without just compensation. See Penn Central, 438 U.S. at 131, 98 S.Ct. 2646.
 
 
 95
 The dissent argues that the property being taken is the landowners' right to exclude, not money. Although I find the argument very intriguing, I cannot agree. If the City of Seattle "takes" the "right to exclude" by imposing a fee, then cities around the country "take" the "right to use" whenever they routinely charge developers any number of general development fees.
 
 
 96
 Nevertheless, I agree with the dissent to the extent that in certain cases drawing distinctions between exactions of money and exactions of land may "elevate form over substance." If, for instance, an exaction of money deprived an owner of exercising rights of ownership, that may amount to an uncompensated taking of property. In the present case, however, appellants have made no showing that the TRAO either forces them to retain tenants against their wishes or disables them from using their land.
 
 
 97
 I also believe the dissent is mistaken in concluding that the Supreme Court's decision to grant certiorari and summarily vacate a takings decision of the California Court of Appeal, remanding for consideration in light of Dolan, Ehrlich v. City of Culver City, 512 U.S. 1231, 114 S.Ct. 2731, 129 L.Ed.2d 854 (1994), instructs us that Dolan should apply to the monetary exactions at issue here. Dolan and Nollan established that a local government may constitutionally condition the right to build on an exaction of physical property without the payment of compensation only if the exaction relates to and is "roughly proportional" to the harm imposed by the proposed development itself. Nollan, 483 U.S. at 837, 107 S.Ct. 3141; Dolan, 512 U.S. at 391, 114 S.Ct. 2309. To satisfy the requirement of rough proportionality, the government must "make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." Dolan, 512 U.S. at 391, 114 S.Ct. 2309.
 
 
 98
 In the absence of a reasoned opinion of the Court, I would hesitate to conclude that Dolan should govern the present case, especially in view of the long history of judicial deference to legislation requiring payment of fees. See, e.g., Houck v. Little River Drainage Dist., 239 U.S. 254, 36 S.Ct. 58, 60 L.Ed. 266 (1915) (a fee is not unlawful under the takings clause "unless the exaction is a flagrant abuse, and by reason of its arbitrary character is mere confiscation of particular property"); United States v. Sperry Corp., 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989) (sustaining a user fee aimed at supporting government services created for the assessed party's benefit); cf. Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980) (striking down a Florida law authorizing a county to retain the interest accruing on a private interpleader fund, where the Court could discern no justification for the deduction of the interest other than the bare transfer of private property to the county).[6]
 
 
 99
 Even the California Supreme Court, which subsequent to the remand in Ehrlich concluded that only "individual and discretionary" monetary exactions are subject to the heightened scrutiny of Nollan and Dolan, recognized that courts have traditionally been deferential to generally applicable development fees or assessments resulting from legislative and political processes aimed at adjusting the benefits and burdens of economic life to promote the common good. Ehrlich v. City of Culver City, 12 Cal.4th 854, 876, 881, 50 Cal.Rptr.2d 242, 911 P.2d 429 (1996). In the present case, appellants attack only a generally applicable assessment resulting from a legislative process.
 
 
 100
 In sum, I would hold that the facts of the case at bar are not amenable to an analysis under the just compensation clause, much less the "individualized determination" required by Dolan.[7] The Constitution protects persons who own property-as well as those persons who do not own property-against a government's arbitrary or irrational imposition of fees. However, I believe this general protection is rooted in the substantive due process clause or perhaps the equal protection clause,[8] not the just compensation clause.
 
 II
 
 101
 Although my brothers appear to disagree, I believe we should next address appellants' claim that the two enactments have deprived them of the substantive due process protections of the Fourteenth Amendment ("nor shall any State deprive any person of life, liberty, or property, without due process of law") Judge Brunetti, citing to Macri v. King County, 126 F.3d 1125 (9th Cir.1997), assumes that the just compensation clause provides the more relevant constitutional limitation and has summarily dispensed with any discussion of the substantive due process issue. As I explain above, I believe that the substantive due process clause provides the more relevant constitutional limitation in the present case, and that therefore the issue does merit our attention.
 
 
 102
 Appellants simply argue that this court should apply the test of Guimont v. Clarke, 121 Wash.2d 586, 854 P.2d 1 (1993), to determine the constitutionality of the enactments under both the Washington Constitution and the U.S. Constitution. In Guimont, the Washington Supreme Court found that a statute requiring mobile home park owners to make payments to displaced tenants violated the Fourteenth Amendment because it placed an oppressive burden upon the owners. In so finding, the court applied the three-prong test of Presbytery of Seattle v. King County, 114 Wash.2d, 320, 330, 787 P.2d 907 (1990) (en banc): "(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner." Guimont, 121 Wash.2d at 609, 854 P.2d 1.
 
 
 103
 While appellants have stipulated that the enactments serve a legitimate public purpose (that of protecting and assisting low-income tenants displaced by private development), they contend that the enactments do not utilize a means reasonably necessary to achieve that purpose and are unduly oppressive.
 
 
 104
 Because it burdens no fundamental rights, the TRAO is "a classic example of an economic regulation" and is subject only to the minimum scrutiny rational basis test. Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 83, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Substantive due process requires only that economic legislation be "supported by a legitimate legislative purpose furthered by a rational means." Pension Benefit Guarantee Corp. v. R.A. Gray & Co., 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 637, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)). Appellants thus bear the heavy burden of establishing that the City, in enacting the TRAO, has acted in an arbitrary and irrational way. Appellants, who argue only that the City could easily have afforded to pay the relocation assistance out of its general budget, have not sustained that burden. No doubt, the City could have provided the assistance out of general funds, just as the City could likely afford to fund many services currently charged to private parties. However, this argument falls far short of establishing that the legislature had acted in an arbitrary and irrational way.
 
 
 105
 With regard to the third Guimont prong, because I concur with Judge Brunetti that the district court acted within its discretion in imposing the discovery sanction for appellants' failure to produce evidence relating to the economic impact of the TRAO, appellants, by their own choice, lack any evidence establishing undue oppression.[9]
 
 III
 
 106
 Because the just compensation clause contemplates the payment of money as a remedy, the clause should not generally operate as a limit on a governmental body's power to legislatively impose fees on property developers or any other persons. The Fourteenth Amendment, however, requires governments to act rationally when imposing such fees. Like Judge Brunetti, I do not find the TRAO "a wise solution to a difficult problem," but because I do not find appellants' arguments weighty enough to justify a finding of a Fourteenth Amendment violation, I must concur in Judge Brunetti's finding of no constitutional violation.
 
 
 
 *
 Hon. Spencer M. Williams, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 The Takings Clause is applicable to the states through the Fourteenth Amendment. See Dolan v. City of Tigard, 512 U.S. 374, 384 n. 5, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)
 
 
 [2]
 " 'Low income' means total combined income per dwelling unit as at or below fifty percent (50%) of the median income, adjusted for family size, in King County, Washington." SMC 22.210.030(G)
 
 
 [3]
 Plaintiffs brought this as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2). The district court defined the plaintiff class as follows:
 For purposes of determining the facial constitutionality of RCW 59.18.440, all past, present and future owners of residential property in jurisdictions that are required to develop a comprehensive plan under RCW 36.70A.040(1) and who are, have been, or may in the future be subject to an ordinance adopted pursuant to RCW 59.18440 requiring such owners to provide reasonable relocation assistance to low-income tenants.
 For purposes of the constitutionality of the TRAO, Ordinance 115141, or any successor thereto, all past present and future owners of residential property who have in the past or may in the future be required to provide cash relocation assistance to low-income tenants under the terms of the Tenant Relocation Assistance Ordinance, Ordinance 115141, or any successor thereto.
 
 
 [4]
 The Tenants Union, a Washington non-profit corporation, joined in the City's motion for summary judgment as a defendant-intervenor
 
 
 [5]
 Plaintiffs also appeal the district court's denial of their facial substantive due process claim. However, because the Takings Clause "provides an explicit source of constitutional protection against the challenged governmental conduct," plaintiffs may maintain only a takings challenge and not a substantive due process challenge. Macri v. King County, 126 F.3d 1125, 1129 (9th Cir.1997) (citations and internal quotation omitted)
 
 
 [6]
 The Takings Clause of the Fifth Amendment of the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend V
 
 
 [7]
 See Parking Assoc. of Georgia, Inc. v. City of Atlanta, 515 U.S. 1116, 115 S.Ct. 2268, 132 L.Ed.2d 273 (1995) (Thomas, J., dissenting from denial of certiorari) (collecting cases of lower courts in conflict); see also Texas Manufactured Housing Ass'n v. Nederland, 101 F.3d 1095, 1104-06 (5th Cir.1996); City of Portsmouth v. Schlesinger, 57 F.3d 12, 17 (1st Cir.1995)
 
 
 [8]
 See, e.g., Clajon Prod. Corp. v. Petera, 70 F.3d 1566, 1578 (10th Cir.1995)
 
 
 [9]
 Plaintiffs argued before the district court that the discovery was irrelevant and overburdensome. On appeal, plaintiffs limit their arguments only to the issue of relevance
 
 
 [1]
 Of course, if a landlord terminates a tenancy prior to completion of the lease term, the tenant has a cause of action under state contract law, and his damages can include incidental damages such as moving expenses. In the absence of such breach, however, the landlord cannot be considered liable for moving expenses
 
 
 [2]
 To be sure, a landowner's decision not to rent space out to tenants may contribute marginally to a city-wide increase in rents, as it reduces the supply of residential units available. However, this attenuated effect is caused by the landowner's exercise of his right to exclude, not by any proposed development. Moreover, the total increase in city-wide rents is no doubt due in significant part to a number of factors beyond the control of any landowner, such as population growth, general inflation, and government regulation
 
 
 [3]
 The only direct costs of moving identified by the City are $291 for physical moving costs, and $100 for utility connection fees and deposits. The City then estimated that tenants would be forced to find new, more expensive housing, resulting in $1,200 in deposits and advanced payments to landlords, and $600 in increased rent
 
 
 [4]
 The court also claims that the plaintiffs have "entirely ignored" this step of the takings analysis. To the contrary, the plaintiffs argued extensively in their brief that the $1,000 exaction indeed gives rise to a taking. (Appellant's Opening Brief at 11-15)
 
 
 [5]
 Perhaps the Supreme Court simply recognized the functional equivalence of exactions of money and exactions of a portion of land. If a government wished to exact a portion of land, it could either (a) exact it directly, or (b) exact a sum of money and use that money to compensate the landowner in an eminent domain proceeding. In either case, the end result is the same: the government has taken the land from the landowner
 The concurrence would apparently have us disregard this functional equivalence when the fee is "a generally applicable assessment resulting from a legislative process." Conc. Op. at 820. However, as Justice Thomas explained in a dissent from a certiorari petition:
 It is not clear why the existence of a taking should turn on the type of governmental entity responsible for the taking. A city council can take property just as well as a planning commission can. Moreover, the general applicability of the ordinance should not be relevant in a takings analysis.... The distinction between sweeping legislative takings and particularized administrative takings appears to be a distinction without a constitutional difference.
 Parking Ass'n of Georgia v. City of Atlanta, 515 U.S. 1116, 1117-18, 115 S.Ct. 2268, 132 L.Ed.2d 273 (1995) (Thomas, J., joined by O'Connor, J., dissenting from denial of certiorari).
 
 
 [6]
 For this reason, even if there were a "long history of judicial deference to legislation requiring payment of fees," as the concurrence claims, Conc. Op. at 4284, the TRAO would still be distinguishable. I nevertheless note that the two cases cited by the concurrence cannot form a part of any well-established history of Takings Clause jurisprudence. The first case, United States v. Sperry Corp., 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989), as discussed above, was only about "user fees," not monetary exactions in general. The second case, Houck v. Little River Drainage Dist., 239 U.S. 254, 36 S.Ct. 58, 60 L.Ed. 266 (1915), did not even address the Takings Clause; rather, it solely concerned the Due Process Clause of the Fourteenth Amendment
 
 
 [7]
 This functional perspective of the TRAO also shows that what is taken is indeed compensable, contrary to the views of the concurrence. Conc. Op. at 4281. Instead of granting the landowners this inadequate option, Seattle could have paid them for their right to exclude with cash, tax breaks, etc. The city's deprivation of the right to exclude is "otherwise proper," First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), but unconstitutional because the compensation was inadequate
 
 
 [8]
 The law at issue in Yee did not exact a physical taking because it provided "that a park owner who wishes to change the use of his land may evict his tenants." Id. at 528, 112 S.Ct. 1522. Although a landowner had to give his tenants six to twelve months advance warning of future plans to change the use of the land, there is no indication anywhere in the Yee opinion that any landlord had to delay construction and to permit continued rental occupancy on account of this notice provision. Suggesting the contrary, the Court explained: "At least on the face of this regulatory scheme, neither the city nor the State compels petitioners, once they have rented their property to tenants, to continue doing so." Id. 527-28, 112 S.Ct. 1522
 
 
 [9]
 Disregarding the economic equivalency of the two laws could lead to an absurd result: whereas a government would be constitutionally unable to pass a law forbidding landlords from evicting their tenants, the government could presumably accomplish the same goal--without violating the Constitution--by simply passing a law requiring landlords to pay evicted tenants an exorbitant amount of money. Unable to afford these payments, the landlords would, in effect, be deprived of their right to exclude the tenants. Surely, there can be no constitutional distinction between these two laws, the effects of which are identical
 Contrary to the suggestion of the concurrence, this economic analysis would not hold unconstitutional "any number of general development fees." Conc. Op. at 820. If these fees were mere "user fees" to cover the cost of processing the development permit, they would not be takings. See Sperry Corp., 493 U.S. at 60, 110 S.Ct. 387. Moreover, even if the amount of the fees exceeded a fair approximation of the cost of the government service provided, they could nonetheless pass constitutional scrutiny if they were "roughly proportional" to the harms caused by the proposed development. See Dolan, 512 U.S. at 391, 114 S.Ct. 2309.
 
 
 [1]
 I think the moniker "takings clause" has given rise to much confusion. As I explain, neither the spirit nor the letter of the clause prohibits a taking of property; it simply requires governments to pay property owners just compensation in certain circumstances. Identifying the clause as the "just compensation clause" may serve to remind us of the clause's primary purpose
 
 
 [2]
 See John D. Echeverria and Sharon Dennis, The Takings Issue and the Due Process Clause: A Way Out of a Doctrinal Confusion, 17 Vt. L.Rev. 695, 709-10 (1993), where the authors emphasize that "[t]he differences in language between the Due Process and Takings Clauses strongly suggest that each clause has a different scope and meaning."
 
 
 [3]
 Appellants' due process claim is also on appeal. See part II, infra
 
 
 [4]
 The dissent argues that the ordinance at issue is in fact "otherwise proper," but that the City neglected to properly compensate appellants for the deprivation of their right to exclude with cash, tax breaks, or other monetary equivalents. I think this analytical approach is unworkable. How could a government define the value of the "right to exclude" without reference to the dollar amount of the mandated fee? Furthermore, compensating the "taking" of monetary payments with cash or tax breaks appears to me to be a de-facto invalidation of the ordinance
 
 
 [5]
 Other courts have expressed discomfort in applying takings principles to actions challenging the constitutionality of government-mandated monetary payments. In Branch v. U.S., 69 F.3d 1571 (Fed.Cir.1995), for example, a plaintiff bank attacked the application of monetary assessment provisions of the Financial Institutions Reform, Recovery and Enforcement Act as a taking of private property without just compensation. The Federal Circuit noted that "because the property allegedly taken in this case was money, that leads to the curious conclusion that the government may take the bank's money as long as it pays the money back." Branch, 69 F.3d at 1575-76. "[T]he takings claim raised in this case amounts to a contention that the Constitution forbids the government from enforcing the [assessment] provision against the [bank] at all." Id. at 1576
 
 
 [6]
 I would submit that, although fashioned as a just compensation case, Webb's, which concerned the facial validity of a statute, and not whether compensation was owing, was at heart premised on the reasonableness requirement of the substantive due process clause
 Furthermore, I should note that the Fifth Amendment case currently before the Supreme Court, Washington Legal Foundation v. Texas Equal Access to Justice Foundation, 873 F.Supp. 1 (W.D.Tex.1995), aff'd in part, rev'd in part, 94 F.3d 996 (5th Cir.1996), reh'g denied by, 106 F.3d 640 (5th Cir.1997), is distinguishable. The amended order granting the petition for writ of certiorari limited the inquiry in that case to whether "interest earned on client trust funds held by lawyers in IOLTA accounts [is] a property interest of the client or lawyer, cognizable under the Fifth Amendment of the United States Constitution, despite the fundamental precept of IOLTA that such funds, absent the IOLTA program, could earn interest for the client of lawyer?" Phillips v. Washington Legal Foundation, --- U.S. ----, 117 S.Ct. 2535, 138 L.Ed.2d 1011. In other words, the case concerns whether interest earned on a client's fund should be designated the property of the client. The present case does not concern the legal designation of any particular identifiable fund.
 
 
 [7]
 Under the pre-Dolan law of this circuit, appellants' just compensation claim would fail. In Commercial Builders of Northern California v. Sacramento, we stated that "[a] purely financial exaction ... will not constitute a taking if it is made for the purpose of paying a social cost that is reasonably related to the activity against which the fee is assessed." 941 F.2d 872 at 876 (9th Cir.1991). In my judgment, the TRAO passes this loose "reasonable relationship" test
 
 
 [8]
 Appellants have not appealed their equal protection claim
 
 
 [9]
 The City argues that this circuit rejected the "unduly oppressive" prong of the Guimont due process test in Kawaoka v. City of Arroyo Grande, 17 F.3d 1227 (9th Cir.1994). Because I believe the due process challenge fails on other grounds, I need not address the City's argument here