**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WEST LINN CORPORATE PARK
L.L.C.,
                *Plaintiff-Appellee,*

v.

CITY OF WEST LINN; BORIS PIATSKI;
JOHN DOES 1-10,
                *Defendants-Appellants.*

No. 05-36061

D.C. No.
CV-01-01787-DCA
District of Oregon,
Portland

WEST LINN CORPORATE PARK
L.L.C.,
                *Plaintiff-Appellant,*

v.

CITY OF WEST LINN; BORIS PIATSKI;
JOHN DOES 1-10,
                *Defendants-Appellees.*

No. 05-36062

D.C. No.
CV-01-01787-DCA
District of Oregon,
Portland

ORDER
CERTIFYING
QUESTIONS TO
THE OREGON
SUPREME COURT

Filed July 28, 2008

Before: Richard C. Tallman and Richard R. Clifton, Circuit
Judges, and Edward R. Korman,* District Judge.

*The Honorable Edward R. Korman, Senior United States District
Judge for the Eastern District of New York, sitting by designation.

9347

**COUNSEL**

Robert E. Franz, Jr., Esq., Law Office of Robert E. Franz, Springfield, Oregon, for the City of West Linn.

Donald Joe Willis, Esq., Schwable, Williamson & Wyatt, Portland, Oregon, for West Linn Corporate Park, LLC.

---

**ORDER**

West Linn Corporate Park, LLC (WLCP) commenced this action in the Circuit Court for Clackamas County, Oregon, against the City of West Linn and other defendants (collectively the City) alleging that the conditions the City placed on the approval of the development of the West Linn Corporate Park amounted to an inverse condemnation under the Oregon Constitution and an uncompensated taking under the Fifth Amendment to the United States Constitution. The City subsequently removed the matter to the United States District Court for the District of Oregon where the City asserted counterclaims seeking a maintenance bond from WLCP and other equitable relief relating to the vacation of a street abutting WLCP's property.

Following a bench trial, the district court entered judgment in favor of the City on WLCP's inverse condemnation and takings claims with respect to off-site improvements WLCP constructed. The district court also denied the City's counterclaims and granted judgment in favor of WLCP on WLCP's takings and inverse condemnation claim relating to the vacation of the abutting street. Finally, the district court granted judgment in WLCP's favor on its First Amendment retaliation claim. The parties cross appealed, and we consolidated the two cases for review.

At their core, the issues presented in this appeal are inextricably intertwined with WLCP's claims of inverse condemna-

tion under Oregon law, and federal law requires us to first resolve these state-law causes of action before reaching the merits of the federal takings arguments. *See, e.g.*, *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985) (at a minimum, a federal takings claim is not ripe for review unless the State has been given the opportunity to deny with finality just compensation for an alleged taking).

This order certifies to the Supreme Court of Oregon three dispositive questions of Oregon law to guide our federal takings analysis. First, we ask whether a plaintiff bringing an inverse condemnation action alleging that a condition of development amounts to an exaction or a physical taking is required to exhaust available local remedies as a prerequisite to bringing his claim in state court. Second, we ask whether a condition of development that requires a plaintiff to construct off-site public improvements, as opposed to dedicating an interest in real property such as granting an easement to a municipal entity, can constitute an exaction or physical taking. Third, we ask whether the vacation of a street approved by the City Council purporting to act pursuant to Or. Rev. Stat. § 271.110 is *ultra vires* where the petition does not comply with the landowner consent provisions of Or. Rev. Stat. § 271.080.

I

We provide the following factual background.[1] The history of this case dates back to 1903 when the City of West Linn, Oregon, recorded the Willamette Tracts subdivision plat. As part of the subdivision, Greene Street and 13th Street were

---

[1]The Supreme Court of Oregon may supplement this statement of facts with any additional information that it deems important from the certified record in order to resolve the certified questions. The parties are obviously free to discuss the factual record in support of their legal positions when they brief the issues before the Supreme Court of Oregon.

dedicated to the City. Greene Street was located on the northern border of the subdivision; 13th Street divided lots four and five on the plat. A modern day approximation is graphically depicted below:



On November 4, 1996, the Willamette Christian Church of West Linn conveyed lot five on the plat to Randal Sebastian for $862,553. Sebastian was associated with the Renaissance Development Corporation, and on November 24, 1997, that entity submitted to the City a design review application for what would become the West Linn Corporate Park, owned by the plaintiff in this case. Ultimately, WLCP obtained lot six on the plat as well.

Around the same time, nearby properties in the subdivision began to develop. On February 10, 1998, the City issued a final order approving the "Summerlinn Apartments," a multi-

unit residential development owned by Show Timber Company. The apartments would be located to the north of WLCP, and based on Show Timber's proposal, traffic to the apartment complex was to be routed thru the intersection of Greene Street and 13th Street.[2]

On March 6, 1998, the City approved Renaissance's design for the corporate park, albeit with caveats — the approval was conditioned on the construction and delivery of public improvements to the City. Those conditions included fourteen requirements:

1.  The applicant shall conform to all Federal, State and Local policies and codes unless granted a written waiver, modification and/or variance by the appropriate deciding body.

2.  The applicant shall deed or dedicate along the development's Blankenship Road frontage, and construct half street improvements along Blankenship Road, consistent with the 10th Street corridor study build-out pavement width requirements and Chapter 92 of the West Linn Community Development Code (the requested sidewalk and planter strip modification is approved and the City Engineer shall establish the necessary Blakenship pedestrian crossing facilities)[.]

3.  The applicant shall improve 13th Street from the development site to Blankenship Road according to the City Engineer's requirements (17% maximum grade as proposed is approved).

4.  The applicant shall petition for vacation of the Greene Street right-of-way abutting the site. The

---

[2]13th Street later was renamed "Summerlinn Drive."

City shall not authorize occupancy of any buildings on the site until the vacation is approved or until the Planning Director finds the issue of Greene Street otherwise resolved. The applicant shall construct a four-foot wide gravel path within 20 feet of the existing right of way from 13th Street to the easterly property boundary, or within an easement or new pedestrian pathway dedication retained by the City as a condition of vacation of the right of way. If the right of way is not vacated, the applicant shall install half-street improvements consistent with the Community Development Code or apply for and receive approval of a variance from the City. . . .

5.  The applicant shall construct the 10th street corridor improvements required by the City traffic study currently being developed by the traffic engineering consultant Kittleson & Associates. (Minimum improvements for the development shall be the construction of the two traffic signal lights and associated improvements at the west bound I-205 freeway off-ramp & 10th Street and the 10th Street & Solamo Road/Blankenship Road intersections, along with a sidewalk on the west side of 10th St. from the River Falls Shopping Center sidewalk and 8th Avenue).

6.  The applicant shall grant towing and ticketing enforcement rights on the fire, life and safety access corridors within the development.

7.  The applicant shall construct the private parking/driveway isles and fire turnarounds not to exceed fifteen percent and eight percent grades respectively,

8.  The applicant shall provide a complete pedestrian path between: Building 'A' and the 13th street sidewalk, and between Building 'A' and the gravel path conditioned to be built on the current Greene Street right-of-way.

9.  The applicant shall 1) meet the City's water quality requirements by constructing the Storm Drainage Master Plan regional water quality facility or if ODOT does not permit [that] project provide an in-lieu of fee to the City allowed by the City of West Linn Municipal Code . . . , 2) record with the County an agreement with the City that requires the property owner to operate and maintain the private storm detention and water quality facilities, and provide third party certification to the City that it is working properly on an annual basis, 3) detain the development's storm water run-off with private detention facilities so that 2, 5, 10 and 25-year post development storm drainage release rate is equal to the 2, 5, 10, and 25-year pre-development release rate, 4) extend the 18″ storm drainage main stub-out located at Blankenship Road and 13th Street to the proposed private storm system out-fall at the top of 13th Street, and 5) construct the Storm Drainage Master Plan Project . . . (10th Street culvert crossing) or construct a 100-year pre-post private storm drainage detention facility for the development.

10. The applicant shall 1) finance the review of the development's fire and domestic water system demands with the City's new Water Master Plan consultant (Montgomery-Watson) to establish all necessary off-site and onsite water improvements required for the development

(The preliminary analysis of the off-site Master Plan water transmission main construction improvements that will be necessary is Phase II of Willamette Falls Drive water transmission main), 2 [ ]) perform actual fire flow tests on the various new private fire hydrants (during an induced high water demand day) that provide proof that the fire flow is adequate to meet each of the buildings fire flow requirements, 3) obtain written approval from the City Engineer and the City Fire Marshall that the necessary fire hydrant flows are available prior to any building related construction with combustible materials, 4) record with the County an agreement with the City that requires the property owner to provide annual certification to the City's Fire Department that the private fire system is operating properly.

11. The applicant shall construct the 13th street master plan sanitary sewer line if Summerlinn Apartments has not successfully received approval for the sanitary sewer inter-basis transfer and the 13th Street master plan line elimination by the time this application needs to complete the 13th Street improvements.

12. The applicant shall construct all of the development's required public improvements prior to receiving any building final inspection and/or certificates of occupancy.

13. To assure adequate protection of trees on site, prior to any site work starting on the property the following shall be completed: [various conditions]

. . .

14. The applicant shall provide for at least six covered bicycle parking spaces.

Following the conditional approval, Sebastian together with Renaissance successfully sought additional investors, formed WLCP, LLC, and transferred the property to the LLC. The corporation's goal, as the name suggests, is to develop and lease business sites.

On October 21, 1998, Sebastian on WLCP's behalf, entered into a public improvements guarantee (PIG) agreement with the City, further memorializing the conditions for the proposed development. Among other things, the PIG conditioned approval on the completion of the improvements by October 15, 1999. The agreement also required WLCP to secure the completion of the Blankenship and 13th Street improvements and the Greene Street water line with a $264,000 performance bond. WLCP complied.

In February 1998, Kittleson issued to the City the consultant's 10th Street traffic study findings. In light of the construction of WLCP and the Summerlin Apartments, consultant Kittleson recommended adding two additional traffic lights in addition to a sidewalk on the west side of 10th Street. According to the study, "[n]o additional roadway work" would be required to accommodate the WLCP project.

The consulting engineer's study made further findings. For example, the study estimated that WLCP would be responsible for approximately 5.4 percent of the vehicles entering the 10th Street corridor during afternoon peak hours and 3.3 percent of the vehicles utilizing the I-205 on-ramps during that same time. These figures, however, assumed full occupancy of the surrounding properties predicted to be finalized by 2018.

As a result of the traffic study, including its future predictions, the City required WLCP (1) to improve the westbound

I-205 ramps and the 10th Street intersection; (2) widen the street; (3) construct additional turn lanes; (4) improve storm drains; (5) create a bike path; (6) relocate street lighting; (7) move utilities; and (8) install new curbs. The City imposed these conditions in addition to the installation of traffic lights and the sidewalk.

According to WLCP, the costs of these improvements totaled $726,225.48. Because the Summerlinn Apartment project was subject to the same conditions, WLCP and Show Timber shared the costs. Thus, WLCP paid its half, totaling $363,112.74.

As also noted in the conditional approval, WLCP was required to build Phase II of the City's Willamette Falls Drive waterline. WLCP maintains that initially the City represented that WLCP could build the waterline underneath previously-engineered transmission lines. The anticipated cost of the improvement would be that of installing the pipe. However, the City ultimately required WLCP to build 1400 feet of waterline through solid rock. Although WLCP shared the cost with Show Timber, construction through solid rock increased the total cost. WLCP incurred $172,049 in waterline installation expenses.

Further, as noted above, WLCP was required to petition to vacate Greene Street and create a gravel pathway. According to WLCP, this construction cost it approximately $14,319. In addition, the City conditioned approval on making improvements to Blankenship Road, constructing waterlines along Greene and 13th Streets, and making improvements along 13th Street including the sewer and storm system. WLCP maintains that these improvements cost another $264,970.

Apparently, the City also demanded that WLCP make cash payments to it in impact fees, and WLCP paid $182,544 as "System Development Charges" (SDCs). SDCs represent what the City considers, and attempts to recapture as, 100 per-

cent of costs that result from the impacts of property development. Because the SDCs were more than the cost of the improvements WLCP delivered to the City, WLCP sought reimbursement for the overpayments. In lieu of paying cash to WLCP, as the City had done for Show Timber, the City provided WLCP with SDC certificates with a face value of $384,450.

SDC certificates, however, are not the functional equivalent of cash. For example, such certificates will only cover up to 50 percent of the SDCs on a future project, may not be exchanged for cash, and are valid only for ten years. To be sure, SDC certificates are alienable: developers may sell them to other developers. But the market for these certificates is small, and the certificates have limited value. In fact, WLCP was only able to sell its certificates for $12,251, a seventy-five percent discount.

WLCP did not meet its construction deadline for all of the public improvements the City required. Nonetheless, WLCP had lined up tenants to occupy the corporate park. Because the improvements remained incomplete, the City was unwilling to issue occupancy permits. Ultimately, after negotiations, WLCP and the City reached a settlement: the City would issue temporary occupancy permits if WLCP agreed to sign a release of certain claims relating to the 10th Street improvements (or the 10th Street corridor as the parties refer to it).[3]

WLCP maintains that the City breached this agreement when it demanded additional improvements to the 10th Street corridor and refused to release the bond with which WLCP secured its performance even though the Oregon Department of Transportation (ODOT) approved its 10th Street improvements and authorized the release of the bond.

---

[3]We do not recount the terms of the agreement in full detail because they are not necessary to answer the certified questions.

On November 8, 2001, WLCP commenced this action in the Clackamas County Circuit Court. The City subsequently removed the action to the United States District Court for the District of Oregon. In its nine-count amended federal complaint, WLCP alleged that the conditions the City imposed on the approval of its development worked a taking in violation of the state and federal Constitutions (counts one and two (inverse condemnation)); the City was unjustly enriched by the improvements WLCP constructed (count three); the City effected a taking of a portion of the intersection at Greene and 13th Street in violation of the state and federal Constitutions (counts four and five (inverse condemnation)); the City and co-defendant City Inspector Boris Piatski retaliated against WLCP in violation of the First Amendment for WLCP's speech (counts six and seven); the City violated the Civil Rights Act under Oregon law by treating WLCP differently than other similarly situated developers (count eight); and the conditions the City imposed were in breach of a 1975 annex agreement (count nine).

For its part, the City asserted five counterclaims seeking declaratory and injunctive relief. The City sought an order compelling WLCP to post a maintenance bond with respect to disputed improvements should the district court order the release of the initial bond (counterclaim one); an order compelling WLCP to convey its interests in the Greene Street and the 13th Street intersection to the City (counterclaim two); a declaration that the City's vacation of Greene Street was null and void (counterclaim three); alternatively, an order rescinding the vacation of Greene Street and requiring the vacation to occur based on the consent of all property owners involved (counterclaim four); and an order to abate further action on the case until the City initiates proceedings to properly vacate Greene Street in accordance with Oregon law (counterclaim five). The City also requested that the district court order WLCP to return the SDC credit certificates in the event damages are awarded.

Thereafter, WLCP filed a motion for partial summary judgment, and the City cross-moved for summary judgment as to all counts. The parties consented to proceedings before United States Magistrate Judge Donald C. Ashmanskas, and he issued an order granting summary judgment to the City on WLCP's eighth and ninth counts. The magistrate judge otherwise denied the cross-motions and set the matter for a bench trial.

The nine-day bench trial commenced on August 30, 2004. On July 15, 2005, Judge Ashmanskas issued his decision orally. He granted relief to WLCP on its inverse condemnation claims set forth in counts four and five and on its claim for unconstitutional retaliation, count six. With respect to the first and second counts' claim of inverse condemnation, the court determined that those counts were unripe for judicial review because WLCP had not availed itself of local remedies. The magistrate judge also reasoned that to the extent those counts related to the 10th Street improvements, WLCP had waived its claims. Finally, the magistrate judge denied relief on WLCP's claim of unjust enrichment (count three) and the City's five counterclaims.

WLCP unsuccessfully moved for reconsideration as to the denial of the inverse condemnation claims, and this timely appeal followed. WLCP challenges only the denial of the first two counts on appeal. The City has cross-appealed and challenges the magistrate judge's denial of its counterclaims as well as the judgment in favor of WLCP on its claims for inverse condemnation set forth in counts four and five, and WLCP's claim for unlawful retaliation.

II

A

We are mindful that the decision to accept and answer certified questions is left to the Oregon Supreme Court's sound

discretion. *See* Or. Rev. Stat. § 28.200; *Western Helicopter Servs., Inc. v. Rogerson Aircraft Corp.*, 811 P.2d 627, 630 (Or. 1991). And the jurisdiction of the Oregon Supreme Court is only properly invoked when the certified questions satisfy five statutory criteria. Those criteria require that "(1) [t]he certification must come from a designated court; (2) the question must be one of law; (3) the applicable law must be Oregon law; (4) the question must be one that 'may be determinative of the cause;' and (5) it must appear to the certifying court that there is no controlling precedent in the decisions of this court or the Oregon Court of Appeals." *Id.*; Or. Rev. Stat. § 28.200. As explained more fully below, because the three certified questions of law largely dictate the justiciability of this matter, are not clearly answered under the present state of Oregon law, and plainly implicate the development of local land use law, we believe the better course of action is to request the Oregon Supreme Court to answer them in the first instance.

B

Article III of the Constitution limits the jurisdiction of federal courts to consideration of actual cases and controversies, and federal courts are not permitted to render advisory opinions. *See Rhoades v. Avon Products, Inc.* 504 F.3d 1151, 1157 (9th Cir. 2007) (citing *Pub. Serv. Comm'n v. Wycoff, Co.*, 344 U.S. 237, 244 (1952)). "Ripeness is more than a mere procedural question; it is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *Southern Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir. 1990).

In *Williamson*, the Supreme Court held that a land owner's Fifth Amendment takings claim against a local government is not ripe until the claimant has availed himself of all the administrative remedies through which the government might reach a final decision regarding the regulations that effect the taking, and any state judicial remedies for determining or

awarding just compensation. *See* 473 U.S. at 186 (holding that "[b]ecause respondent has not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property, nor utilized the procedures Tennessee provides for obtaining just compensation, respondent's claim is not ripe"). The first condition, which has come to be known as "prong-one ripeness," requires a claimant to utilize available administrative mechanisms, such as seeking variances from overly-restrictive or confiscatory zoning ordinances, so that a federal court can assess the scope of the regulatory taking. *Id.* at 190-91. The second condition ("prong-two ripeness") is based on the principle that "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Id.* at 194. Consequently, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the [federal] Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 195.

## C

Although *Williamson* arose in the context of an alleged regulatory taking, we have held that physical takings or exactions[4] employ, if at all, a modified form of the *Williamson* analysis. *Daniel v. County of Santa Barbara*, 288 F.3d 375, 382 (9th Cir. 2002). In *Daniel*, we explained that under California law, the question was not whether a landowner need satisfy prong-one ripeness. After all, those considerations are "automatically satisfied at the time of the physical taking" for "[w]here there has been a physical invasion, the taking occurs at once,

---

[4]The term "physical taking," or a physical intrusion to benefit the public that the government causes to be placed on private property, generally is synonymous with an "exaction," or a condition of development that local government places on a landowner to dedicate a real interest in the development property for public use. *See, e.g.*, *Dolan v. City of Tigard*, 512 U.S. 374 (1994).

and nothing the city can do or say after that point will change that fact." *Id.* Rather, the only pertinent inquiry is prong two. We emphasized that "as in a regulatory takings case, the property owner must [still] have sought compensation for the alleged taking through available state procedures." *Id.*

## III

### A

The availability, applicability, and adequacy of such state procedures require us to examine Oregon law in this instance. *See id.* We therefore turn to the first basis for our certification order, whether Oregon law requires a landowner alleging a claim of inverse condemnation arising from conditions of development seeking exactions to exhaust available remedies to obtain a final determination from the State that it will pay no compensation. Stated otherwise, was WLCP's complaint filed in the Clackamas County Circuit Court sufficient under Oregon law to seek a final determination of compensation? Because the justiciability of WLCP's takings claims turns on the Oregon Supreme Court's answer, this "question of law" is one that is "determinative of the cause." *Western Helicopter Servs., Inc.*, 811 P.2d at 630.

The Oregon Supreme Court has not had occasion to consider this specific question of exhaustion. Two decisions, however, one from the Oregon Court of Appeals, and another from the Land Use Board of Appeals, reach opposite conclusions, highlighting, we feel, the unsettled nature of this aspect of Oregon law. *Compare Nelson v. City of Lake Oswego*, 869 P.2d 350 (Or. Ct. App. 1994) *with Reeves v. City of Tualatin*, 31 Or. LUBA 11, 1996 WL 33118832 (1996).

In *Nelson*, plaintiff landowners applied to the city for a permit to build a house. After reviewing the application, the city determined that, based on a faulty property description, it would grant the application only after the landowners applied

for and obtained a lot line adjustment between their property and the adjoining neighbors. The city approved the landowner's adjustment, but conditioned it upon the execution of "nonremonstrance" agreements in which the landowners agreed not to oppose future street improvements. The city also required the landowners to convey a fifty-five foot drainage easement as a condition of approval. The landowners did not appeal any of the city's conditions as was permitted under the city code, and instead filed suit in state court.

The court of appeals found that all but one of the landowners' claims were subject to exhaustion of local remedies. The condition that the landowners convey the drainage easement, it reasoned, was not. Citing to *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986), the Oregon Court of Appeals explained that "[t]here is good reason why the courts have not extended the exhaustion/ripeness requirement to cases like this one [involving an exaction]: They have nothing to do with its purpose." *Nelson*, 869 P.2d at 353. In fact, the purpose of the ripeness requirement stems from the nature of a regulatory taking itself:

> It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property. A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes.

> The tests for regulatory takings under the state and federal constitutions are whether the owner is deprived of *all* substantial beneficial or economically viable use of property. The reason why the exhaustion/ripeness analysis makes sense in that context is that, with rare exceptions, no *particular* denial of an application for a use can demonstrate the loss of all economic use. That is so for two rea-

> sons. First, the fact that one use is impermissible under the regulations does not necessarily mean that other economically productive uses are also precluded; and second, until alternative uses are applied for or alternative means of obtaining permission for the first use are attempted, there can be no conclusive authoritative determination of what is legally permitted by the regulations. Therefore, the courts cannot perform their adjudicative function on a claim predicated on a single denial, because something more must be decided by the local or other regulatory authority before there *can* be a demonstrable loss of all use and, therefore, a taking.

*Id.* at 353-54 (internal citations and quotation marks omitted).

By contrast, in the case of an exaction, such as a drainage easement, the court of appeals continued, "the condition has been imposed and the easement has been acquired by the city." *Id.* at 354. As a result, nothing further must occur "at the local or administrative level in order for the claim to be susceptible to adjudication; the only question is whether what *has* occurred *is* a taking under the legal test that the condition must bear a reasonable relationship to the impacts of the use to which the city has attached it." *Id.* (citation omitted). Indeed, "[t]he facts on both sides of the equation are readily susceptible to conventional judicial proof, and the adjudication of the facts and of the applicable law is well within the judicial competence." *Id.* The holding in *Nelson* supports the proposition that a landowner need not exhaust local remedies in a physical takings case before bringing his inverse condemnation claim in state court.

*Reeves*, a case that postdates *Nelson*, appears to us to retain language that would, at least in some instances, require exhaustion in an exactions case. In that case, the petitioner sought approval for a fifty-five unit subdivision in the city's low density residential planning district. The city approved

the application, but conditioned it on, among other things, dedicating a ten-foot right of way, improving up to the center line a street abutting the property, paving part of that street, constructing a bicycle lane, and extending a twelve-inch water line for later expansion by the city.

In concluding that the petitioner had not exhausted available remedies, the board of appeals distinguished *Nelson* on two grounds. First, the board explained, "[i]n *Nelson* the applicant could not have anticipated that dedication of an easement would be required. It was simply imposed as part of the approval." *Reeves*, 1996 WL 33118832, at *4. As a result, "[e]ven if a variance process had been available, the first time the applicant would have known of the need to request a variance was after the approval was granted." *Id.* Since petitioner Reeves could have availed himself of such an appeal at the outset, the board concluded that his failure to avail himself of that remedy was fatal.

Second, the board reasoned that at the time of the action, the easement in *Nelson* already had been granted. By contrast, the city had not yet acquired the easement in *Reeves*. Consequently, in the board's view, there was *still* something left to happen at the local level, such as determining the extent to which the city would impose the conditions on petitioner Reeves's property.

In this case, it is undisputed that WLCP exhausted no local remedies that were available before bringing its manifold claims. If the Oregon Supreme Court holds that a plaintiff bringing an inverse condemnation claim premised on allegations of overreaching exactions must first do so, then WLCP's federal takings claims are not yet ripe for our review and we will dismiss that portion of WLCP's appeal. Because this question of inverse condemnation jurisprudence is unsettled in Oregon, and because, if clarified definitively by the Oregon Supreme Court, the answer will have far-reaching effects on commercial development in Oregon, we have concluded that

the better course of action is to certify this issue to the Oregon Supreme Court.

## B

The Oregon Supreme Court similarly has not had occasion to consider whether conditions of development that require off-site public improvements, that is, a requirement that a landowner improve public property — outside of the proposed development site — in which the landowner has no property interest can amount to an exaction. One case from the Oregon Court of Appeals of which we are aware squarely answers that question in the affirmative. *See Clark v. City of Albany*, 904 P.2d 185 (Or. Ct. App. 1995). However, a recent Oregon Court of Appeals decision has cast doubt on the continuing validity of *Clark*. *See Dudek v. Umatilla County*, 69 P.3d 751 (Or. Ct. App. 2003).

In *Clark*, the city conditioned the approval of a site plan for a fast food drive-in store on improvements to a nearby street, the drainage system, and sidewalks, among others. Those improvements were codified as conditions four and five, and read as follows:

> 4.  Prior to issuance of building permits, design for street improvements for Spicer Road. The improvements shall be for an ultimate width of 36 feet, and shall extend from a point 150 feet east of the subject property east property line to the intersection of the Santiam Highway. The design section shall be sufficient for a minor collector street designation. Make design allowances for a commercial driveway intersecting Spicer Road at the current commercial driveway intersection.

> 5.  Prior to issuance of building permits, provide financial assurances for or construct improvements to Spicer Road. Improvements shall consist of a par-

tial street, drainage, and minimum seven foot curb line sidewalk improvements with appropriate transitions to the east and west of the subject property. Depending on the condition and section of the existing roadway, an overlay may be required on portions of the roadway not being incorporated into the partial street improvement.

*Id.* at 187.

The city maintained that these exactions were not subject to the analysis set forth in *Dolan*, 512 U.S. at 374 (treating exactions as different from regulatory takings and essentially the same as a physical taking), because they "[did] not require a dedication of a property interest to the public or the body from which the development approval [was sought]." *Clark*, 904 P.2d at 189. In rejecting that argument, the court of appeals reasoned:

> [O]n their face, conditions 4 and 5 do impose exactions that are subject to the *Dolan* analysis: They require petitioner, as a prerequisite to developing his property, to make road improvements on and extending beyond the affected property, and the improvements are to be available for some public use.

> We implicitly concluded [that *off-site* improvements that do not require the dedication or transfer of property interest do not amount to exactions] in *J.C. Reeves Corp. v. Clackamas County*, 131 Or.App. 615, 887 P.2d 360 1994), where we applied the *Dolan* test to developmental conditions analogous to conditions 4 and 5 here.

> . . .

> [T]he fact that *Dolan* itself involved conditions that required a dedication of property interests does

not mean that it applies *only* to conditions of that kind. This case is not the appropriate one for universal line-drawing because, in our view, there is no relevant and meaningful distinction between conditions that require conveyances and conditions like the fourth and fifth ones here. For purposes of takings analysis, we see little difference between a requirement that a developer convey title to the part of the property that is to serve a public purpose, and a requirement that the developer himself make improvements on the affected and nearby property and make it available for the same purpose. The fact that the developer retains title in, or never acquires title to, the property that he is required to improve and make available to the public, does not make the requirement any the less a burden on his use and interest than corresponding requirements that happen also to entail memorialization in the deed records.

*Id.* (citations omitted).

In *Dudek*, the court of appeals suggested that *Clark* was open to question following the United States Supreme Court's decision in *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999). The Oregon Court of Appeals explained:

[O]ur holding in *Clark v. City of Albany*, regarding the application of *Dolan* to the imposition of requirements to make off-site improvements is open to question following the Supreme Court's decision in [*Del Monte Dunes*]. In that case, the Supreme Court cautioned against application of the test in *Dolan* beyond "the special context of exactions-land use decisions conditioning approval of development on the dedication of property to public use." The recent federal decisions cited suggest such a condition, to the extent that it requires the expenditure of

money and not a giving over of a real property interest, might not fall under the same review as a real property exaction requirement of the sort seen in *Dolan*.

*Dudek*, 69 P.3d at 758 n.10.

In this case, it is unclear how Oregon law would classify the conditions placed on the development of the West Linn Corporate Park to improve public property off its site. On the one hand, if the Oregon Supreme Court holds that such conditions can amount to an exaction, then assuming there is no need for exhaustion, we may proceed to analyze the conditions under the *Dolan* framework. If, on the other hand, the Oregon Supreme Court concludes that off-site public improvements do not amount to exactions, then it is unclear whether under Oregon law, there is any viable cause of action for inverse condemnation. As above, this question has potentially broad implications that, if definitively clarified by the Oregon Supreme Court, would affect local level development efforts. An answer would be dispositive as to this portion of the federal appeal.

C

Finally, no Oregon court of which we are aware has had occasion to consider the legal effect of a street that was purportedly vacated by the procedures set forth under Oregon Revised Code § 271.120 but that did not comply with the landowner consent provisions of Oregon Revised Code § 271.080. It is undisputed that the map depicting the portion to be vacated was in error when the petition was circulated for approval by affected landowners in the neighborhood.

As noted, condition of development 4 required WLCP to "petition for vacation of the Greene Street right-of-way abutting the site. The applicant shall construct a four foot wide gravel path within 20 feet of the existing right of way from

13th Street to the easterly property boundary, or within an easement or new pedestrian pathway dedication retained by the City as a condition of vacation of the right of way." This requirement was further codified in the PIG agreement, which noted "[t]hese improvements include waterline improvements on Green[e] Street . . . and the gravel path within the Greene Street vacation area."

In accordance with the City's demand, Show Timber, which was subject to the same condition, employed engineers to draw up a legal description of the proposed vacation of Greene Street. Thereafter, consent of area property owners was obtained based on the legal description. The legal description, however, did not include the intersection of 13th Street and Greene Street (the disputed intersection).

The proposed vacation was then submitted to the City. However, City planner Eric Spir objected to the proposal, and the City ultimately demanded that Greene Street be vacated in its entirety. The consulting engineers objected to the City's demand because, they reasoned, through traffic on 13th Street would be blocked as a result.

Show Timber and WLCP acquiesced. A new legal description was prepared that included the disputed intersection. This second legal description was incorporated into public notices published for proposes of the vacation and the subsequent public hearing on the matter. Following the public hearing, the City Council approved the vacation of Greene Street in its entirety and passed City Ordinance No. 1439, which codified the vacation.

WLCP contends that Ordinance No. 1439 had the full legal effect of vacating Greene Street, and by operation of law, a portion of the intersection vested in it free of any interest held by the City. The City maintains that the ordinance has no legal effect because it was adopted without the consent of all necessary landowners.

Oregon Revised Code § 271.080(2) requires "the consent of the owners of all abutting property and of not less than two-thirds in area of the real property affected thereby" to "be appended to [the] petition [for vacation], as a part thereof and as a basis for granting the same[.]" It is undisputed that, although the first legal description submitted contained the required landowner consent, the second amended description that was submitted with the petition did not.

It is otherwise conceded that the statutory formalities were followed. The petition was presented to the city recorder, found to be sufficient, filed, and at least one petitioner was given notice of when the matter would come before the City Council. *See* Or. Rev. Stat. § 271.090. Public notices containing the second legal description were published along with the date for the public hearing. *See* Or. Rev. Stat. § 271.110. Finally, the City Council at a public hearing "hear[d] the petition and any objections [and] . . . determine[d] [that] the consent of the owners of the requisite area ha[d] been obtained, [t]hat notice ha[d] been duly given and [that] the public interest will [not] be prejudiced by the vacation of such . . . street." Or. Rev. Stat. § 271.120. Consequently, the City Council "m[ade] such determination a matter of record and vacate[d] such . . . street[.]" *Id.* It adopted Ordinance 1439.

Thus, the question we confront is whether Ordinance 1439 was an *ultra vires* act because although the City Council followed procedural formalities in its adoption, the petition presented for its consideration did not fully comply with Oregon Revised Statute § 271.080. If the Oregon Supreme Court answers this question in the affirmative, the vacation of Greene Street is null and void, and we must vacate the district court's judgment that an interest in a portion of Greene Street vested in favor of WLCP, *see* Or. Rev. Stat. § 271.140, and the City's use of the disputed intersection worked a taking. If the Oregon Supreme Court answers this question in the negative, the district court's ruling will be affirmed.

IV

## ORDER

In light of our foregoing discussion, and because the answers to these questions of Oregon law for which there is unclear precedent are determinative of the federal cause, *see* Or. Rev. Stat. § 28.2000, we respectfully certify to the Oregon Supreme Court the following questions under Oregon law:

(1) Must a landowner alleging that a condition of development amounts to an exaction or physical taking exhaust available local remedies before bringing his claim of inverse condemnation in an Oregon state court?

(2) Can a condition of development that requires a landowner to improve off-site public property in which the landowner has no property interest constitute an exaction?

(3) Under Or. Rev. Stat. § 271.120, is a City Council's purported vacation of a street *ultra vires* when the petition for vacation does not comply with the landowner consent provisions of Or. Rev. Stat. § 271.120?

We do not intend, by the phrasing of these questions, to restrict the Oregon Supreme Court's consideration of the issues. The Oregon Supreme Court may, of course, in its discretion reformulate the questions. *Broad v. Mannesman Anlagenbau AG*, 196 F.3d 1075, 1076 (9th Cir. 1999).

If the Oregon Supreme Court accepts review of the certified questions, we designate WLCP to file the first brief pursuant to Oregon Rule of Appellate Procedure 12.20.

The Clerk of Court is hereby ordered to transmit forthwith to the Oregon Supreme Court, under official seal of the

United States Court of Appeals for the Ninth Circuit, a copy of this order and all briefs and excerpts of record. Or. Rev. Stat. § 28.215; Or. R. App. P. 12.20.

Further proceedings in this court on the certified questions are stayed pending the Oregon Supreme Court's decision whether it will accept review and, if so, receipt of the answer to the certified questions. The case is withdrawn from submission until further order from this court. The panel will resume control and jurisdiction upon receipt of an answer to the certified questions or upon the Oregon Supreme Court's decision to decline to answer the certified questions. When the Oregon Supreme Court decides whether or not to accept the certified questions, the parties shall file a joint status report informing this court of the decision. If the Oregon Supreme Court accepts the certified questions, the parties shall file a joint status report informing this court when the Oregon Supreme Court issues its answers.

It is so **ORDERED**.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2008 Thomson Reuters/West.