# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DANIEL MCCLUNG; ANDREA
MCCLUNG, individually and as a
marital community,
　　　　　*Plaintiffs-Appellants,*

　　　　　and

TAPPS BREWING, INC., a
Washington corporation,
　　　　　*Plaintiff,*

　　　　　v.

CITY OF SUMNER,
　　　　　*Defendant-Appellee.*

No. 07-35231

D.C. No.
CV-06-05006-RBL

ORDER
AMENDING
OPINION AND
DENYING
REHEARING AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
July 11, 2008—Seattle, Washington

Filed September 25, 2008
Amended December 1, 2008

Before: Richard R. Clifton and N. Randy Smith,
Circuit Judges, and J. Michael Seabright,* District Judge.

Opinion by Judge Seabright

---

*The Honorable J. Michael Seabright, United States District Judge for
the District of Hawaii, sitting by designation.

15827

**COUNSEL**

William C. Severson, William C. Severson PLLC, Seattle, Washington, for the plaintiffs-appellants.

Michael C. Walter, Keating, Bucklin & McCormack, Inc., Seattle, Washington, for the defendant-appellee.

**ORDER**

The opinion filed on September 25, 2008, is amended as follows:

On slip Opinion page 13750, insert a new footnote 3 at the bottom of the page after the sentence that ends ". . . applies to Ordinance 1603." (and renumber the subsequent footnotes):

> We observe that the ordinance before us concerns a permit condition designed to mitigate the adverse effects of the new development. New construction increases the burden on the City's sewer system and increases the loss that might result from flooding. After experiencing considerable flooding, the City enacted Ordinance 1603 to require most new developments to include specified storm pipes. We are not confronted, therefore, with a legislative development condition designed to advance a wholly unrelated interest. We do not address whether *Penn Central* or *Nollan/Dolan* would apply to such legislation.

With the opinion as amended, Judge Clifton and Judge N.R. Smith voted to deny the petition for rehearing en banc and Judge Seabright so recommended.

The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing en banc, filed October 9, 2008, is DENIED.

No further petitions for rehearing or rehearing en banc may be filed by the parties.

---

## OPINION

SEABRIGHT, District Judge:

In 1995, Daniel and Andrea McClung (the "McClungs") sought to develop property they owned in the City of Sumner (the "City"), and learned that their underground storm drain pipe did not meet the City's requirement for new developments to include pipes at least 12 inches in diameter. The McClungs assert that the City's subsequent request that they install a 24-inch pipe in exchange for the City approving their permit application and waiving certain permit and facilities fees effected an illegal taking of their property. This case presents an issue of first impression in this Circuit — whether a legislative, generally applicable development condition that does not require the owner to relinquish rights in the real property, as opposed to an adjudicative land-use exaction, should be reviewed pursuant to the ad hoc standards of *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), or the nexus and proportionality standards of *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994). We affirm,

holding that the *Penn Central* analysis applies to the 12-inch pipe requirement. As for the installation of the 24-inch pipe, we conclude that the McClungs voluntarily contracted with the City to install the 24-inch pipe and thus the installation of that pipe was not a "taking" by the City.

## I.

Between 1990 and 1992, the City experienced considerable flooding. To address this problem, the City took several steps, including adopting Ordinance 1603 which requires most new developments to include storm pipes with a minimum 12-inch diameter, outlining plans for the City to replace certain storm pipes with 18-, 21-, and 24-inch pipe, and constructing a storm drainage trunk line paid for in part through raising the stormwater general facility charge ("GFC") imposed on property owners.

Between 1983 and 1993, the McClungs purchased four adjoining residential properties in the City, and in May 1994, approached the City about converting one property into a Subway sandwich shop and paving an alley for use as a parking lot. The City had previously vacated this alley in exchange for certain conditions, including receiving an easement for public utilities and services that ran under the alley. During the course of discussions regarding the steps the McClungs would need to take to comply with the City's flood requirements, the parties learned that the storm pipe under the property was 12-inch pipe for four feet, then changed to 6-inch pipe for the remaining 350 feet. Because this pipe did not comply with Ordinance 1603 and did not meet the City plans for replacing certain pipes with 24-inch pipe, the City Engineer, via letter, offered to waive certain fees in exchange for the McClungs installing a 24-inch instead of 12-inch pipe:

> To correct existing deficiencies, meet the needs of your development and satisfy the future requirements as outlined in the Storm Water Comprehen-

sive Plan, a 24-inch diameter storm drain is to be installed as a condition of development.

. . .

As a developer, you are required to install a 12-inch storm drain as a minimum. My estimate shows the cost difference between a 12-inch and a 24-inch diameter pipe ranges from $7,200 to $7,500. To off-set the cost of the oversizing to meet the City's Comprehensive Plan requirements, the City will waive the storm drainage General Facilities Charge, permit fees, plan review and inspection charges of the storm drainage systems for both the development and the Subway Shop. . . . If you find this acceptable, please proceed with the revisions to the Plans.

The McClungs revised their development plan to include a 24-inch pipe, which was approved on April 25, 1996. A 24-inch pipe was subsequently installed on the property.

Despite voicing no objection to the 24-inch pipe installation requirement and receiving the benefit of certain fees being waived, on April 27, 1998, the McClungs filed a complaint in Washington state court asserting violations of Washington state law. After several years of protracted state court litigation (including a summary judgment motion, an appeal, a trial, and further appeals), the Washington appeals court found that the McClungs should be permitted to amend their complaint to allege explicitly a violation of their Fifth Amendment rights and remanded the action to the trial court. *Tapps Brewing, Inc. v. McClung*, 2005 WL 151932, at *8 (Wash. App. Jan. 25, 2005).

The McClungs subsequently amended their complaint to allege that the City's requirement that they upgrade the storm drain was a taking in violation of the Fifth Amendment. In

response, the City removed the action to the United States District Court for the Western District of Washington.

On cross-motions, the McClungs sought summary judgment on their federal takings claim, and the City sought summary judgment on all remaining claims.[1] *See Tapps Brewing, Inc. v. City of Sumner*, 482 F. Supp. 2d 1218, 1224-25 (W.D. Wash. 2007). For the McClungs' takings claim, the court separately analyzed Ordinance 1603's requirement that all new developments include 12-inch storm pipe and the City's request that the McClungs install a 24-inch storm pipe. Applying the ad hoc analysis of *Penn Central*, the court determined that the 12-inch storm pipe requirement was not an unconstitutional taking. *Id.* at 1228-31. Regarding the 12-inch to 24-inch request, the court found that the McClungs had contracted to install the 24-inch pipe in exchange for a waiver of the GFC and various fees. *Id.* at 1231. The McClungs' appeal followed.

## II.

The district court's grant of summary judgment in favor of the City is reviewed de novo, under the same standards applied by the district court. *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, 538 F.3d 1090, 1094 (9th Cir. 2008). "We must determine whether, viewing the evidence in the light most favorable to the nonmoving party, any genuine issues of material fact exist, and whether the district court correctly applied the relevant substantive law." *Fazio v. City & County of S.F.*, 125 F.3d 1328, 1331 (9th Cir. 1997).

---

[1]The district court granted the City's motion on the McClungs' state law claims. *See Tapps Brewing, Inc. v. City of Sumner*, 482 F. Supp. 2d 1218, 1231-33 (W.D. Wash. 2007). The McClungs do not appeal this determination.

III.

A.

Before turning to the merits of this appeal, we address briefly the issue of ripeness, "lest we overstep our jurisdiction."**²** *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 871 (9th Cir. 2001) (en banc).

Ripeness "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993); *Portman v. County of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993) ("The ripeness inquiry contains both a constitutional and a prudential component."). While Article III ripeness is jurisdictional, "[p]rudential considerations of ripeness are discretionary. . . ." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1142 (9th Cir. 2000) (en banc).

**[1]** Although the Supreme Court has described takings claim ripeness as addressing prudential rather than Article III considerations, *see Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 733-34 (1997) (describing the ripeness standard of *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson*, 473 U.S. 172 (1985), as a "prudential hurdle" to a regulatory takings claim), our Circuit has analyzed takings claim ripeness as raising both prudential and Article III considerations. *Compare Beverly Blvd. LLC v. City of West Hollywood*, 238 Fed. Appx. 210, 212 (9th Cir. 2007) ("We need not resolve whether this claim is ripe under the standards articulated in *Williamson* . . . and . . . assume without deciding that the takings claims are ripe in order to

---

**²**The district court found the McClungs' claim ripe for review. *See Tapps Brewing, Inc.*, 482 F. Supp. 2d at 1227-28. On appeal, the City originally argued that the McClungs' takings claim was not ripe, but then at the hearing agreed with the McClungs that the claim was indeed ripe.

reject them on the merits."); *and Weinberg v. Whatcom County*, 241 F.3d 746, 752 n.4 (9th Cir. 2001) ("We assume without deciding that the Federal takings claim is ripe."); *with West Linn Corporate Bank L.L.C. v. City of West Linn*, 534 F.3d 1091, 1099 (9th Cir. 2008) (describing ripeness as " 'determinative of jurisdiction' " (quoting *S. Pac. Transp. Co. v. City of L.A.*, 922 F.2d 498, 502 (9th Cir. 1990))); *Vacation Village, Inc. v. Clark County*, 497 F.3d 902, 912 (9th Cir. 2007) (same); *and Hacienda Valley Mobile Estates v. City of Morgan Hill*, 353 F.3d 651, 661 (9th Cir. 2003) (affirming district court's determination of lack of subject matter jurisdiction based on a *Williamson* analysis).

**[2]** We need not determine the exact contours of when takings claim ripeness is merely prudential and not jurisdictional. In this case, we easily conclude that the facts presented raise only prudential concerns. The McClungs installed the storm pipe over ten years ago, resulting in a clearly defined and concrete dispute. *See Thomas*, 220 F.3d at 1139 (stating that Article III ripeness requires the court to analyze whether the "alleged injury is too 'imaginary' or 'speculative' to support jurisdiction"). Because this case raises only prudential ripeness concerns, we have discretion to assume ripeness is met and proceed with the merits of the McClungs' takings claim. Accordingly, we do not resolve whether this claim is ripe under the standards articulated in *Williamson*, and instead assume without deciding that the takings claim is ripe in order to address the merits of the appeal.

### B.

At issue are two different upgrades — Ordinance 1603 requiring that all new developments include a minimum of 12-inch storm pipe, and the request that the McClungs install a 24-inch pipe. We analyze these two upgrades separately, and hold that the district court properly found that the *Penn Central* analysis applies to the 6- to 12- inch requirement, and that the McClungs contracted to install a 24-inch pipe.

1.

**[3]** The Ninth Circuit has yet to address whether a legislative, generally applicable development condition that does not require the owner to relinquish rights in the real property, as opposed to an adjudicative land-use exaction, should be addressed under the *Penn Central* or *Nollan/Dolan* framework. Other courts addressing this general issue have come to different conclusions. *Compare Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1579 (10th Cir. 1995) (finding that "[g]iven the important distinctions between general police power regulations and development exactions, and the resemblance of development exactions to physical takings cases, we believe that the 'essential nexus' and 'rough proportionality' tests are properly limited to the context of development exactions"); *City of Olympia v. Drebick*, 126 P.3d 802, 807-08 (Wash. 2006) (rejecting the view "that local governments must base GMA impact fees on individualized assessments of the direct impacts each new development will have on each improvement planned in a service area"); *San Remo Hotel L.P. v. City & County of S.F.*, 41 P.3d 87, 104-05 (Cal. 2002) (distinguishing between a fee condition applied to a single property that would be subject to *Nollan/Dolan* review, and a generally applicable development fee); *Home Builders Ass'n of Cent. Ariz. v. City of Scottsdale*, 930 P.2d 993, 1000 (Ariz. 1997) (finding that *Dolan* does not apply to a generally applicable legislative decision); *and McCarthy v. City of Leawood*, 894 P.2d 836, 845 (Kan. 1995) (concluding that nothing in *Dolan* supports its application to impact fees); *with Town of Flower Mound v. Stafford Estates Ltd.*, 135 S.W.3d 620, 636 (Tex. 2004) (finding that the *Nollan/Dolan* analysis is not limited to dedications of land); *and Home Builders Ass'n v. City of Beavercreek*, 729 N.E.2d 349, 356 (Ohio 2000) (applying *Nollan/Dolan* in "evaluating the constitutionality of an impact fee ordinance").

After reviewing the cases establishing these tests and the

principles underlying them, we conclude that *Penn Central* applies to Ordinance 1603.**³**

A plaintiff seeking to challenge a government action as an uncompensated taking of private property may proceed under one of four theories: by alleging (1) a physical invasion of property, (2) that a regulation completely deprives a plaintiff of all economically beneficial use of property, (3) a general regulatory takings challenge pursuant to *Penn Central*, or (4) a land-use exaction violating the standards set forth in *Nollan* and *Dolan*. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 548 (2005). At issue here is application of the latter two doctrines.

**[4]** In *Penn Central*, the New York City Landmarks Preservation Commission refused to approve plans to construct an office building over Grand Central Terminal due to its "landmark" status under the Landmarks Preservation Law. *Penn Central*, 438 U.S. at 116-17. *Penn Central* recognized that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* at 124 (citation omitted); *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322-23 (2002) (distinguishing cases involving physical possession of property versus regulations that do not cause a categorical taking). *Penn Central* acknowledged that it was "unable to develop any 'set formula' " for evaluating these types of claims, but identified

---

**³**We observe that the ordinance before us concerns a permit condition designed to mitigate the adverse effects of the new development. New construction increases the burden on the City's sewer system and increases the loss that might result from flooding. After experiencing considerable flooding, the City enacted Ordinance 1603 to require most new developments to include specified storm pipes. We are not confronted, therefore, with a legislative development condition designed to advance a wholly unrelated interest. We do not address whether *Penn Central* or *Nollan/ Dolan* would apply to such legislation.

relevant factors, such as the economic impact of the regulation on the claimant, the extent to which the regulation has interfered with distinct investment-backed expectations, and the character of the governmental action. *Penn Central*, 438 U.S. at 124; *see also Lingle*, 544 U.S. at 538-39 (discussing *Penn Central*).

In comparison to *Penn Central*, "[b]oth *Nollan* and *Dolan* involved Fifth Amendment takings challenges to adjudicative land-use exactions — specifically, government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit." *Lingle*, 544 U.S. at 546. In *Nollan*, the California Coastal Commission conditioned the grant of Nollan's development/rebuilding permit of his beachside home on Nollan's dedication of an easement on the property to the public. *Nollan*, 483 U.S. at 828. In *Dolan*, the Oregon Land Use Board of Appeals conditioned the grant of Dolan's permit to expand a store and parking lot on Dolan's dedication of a portion of the relevant property as a "greenway" and bicycle/pedestrian pathway. *Dolan*, 512 U.S. at 379-80. The Supreme Court recently described the holdings of these cases as follows:

> In each case, the Court began with the premise that, had the government simply appropriated the easement in question, this would have been a *per se* physical taking. [*Dolan*, 512 U.S. at 384; *Nollan*, 483 U.S. at 831-32]. The question was whether the government could, without paying the compensation that would otherwise be required upon effecting such a taking, demand the easement as a condition for granting a development permit the government was entitled to deny. The Court in *Nollan* answered in the affirmative, provided that the exaction would substantially advance the same government interest that would furnish a valid ground for denial of the permit. [*Nollan*, 483 U.S. at 834-37.] The Court further

> refined this requirement in *Dolan*, holding that an adjudicative exaction requiring dedication of private property must also be " 'rough[ly] proportiona[l]' . . . both in nature and extent to the impact of the proposed development." [*Dolan*, 512 U.S. at 391.]

*Lingle*, 544 U.S. at 546-47. In *Nollan*, the Court stuck down the condition as an unconstitutional taking because there was no logical connection (*i.e.*, no "essential nexus") between the adverse impacts of the development and the required easement. *Nollan*, 483 U.S. at 837. In *Dolan*, the Court found the exactions unconstitutional because the City failed to show that the conditions were roughly proportional to the negative impacts caused by the development. *Dolan*, 512 U.S. at 394-95.

The facts of *Nollan* and *Dolan* — involving adjudicative, individual determinations conditioning permit approval on the grant of property rights to the public — distinguish them from the line of cases upholding general land use regulations. *Dolan*, 512 U.S. at 384-85. Unlike the facts of *Dolan*, cases questioning land use regulations "involve[ ] essentially legislative determinations classifying entire areas of the city" and placing limitations on the use owners may make of their property. *Id.* at 385. In comparison to legislative land determinations, the *Nollan/Dolan* framework applies to adjudicative land-use exactions where the "government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit." *Lingle*, 544 U.S. at 546. Indeed, the Supreme Court has recognized that it has "not extended the rough-proportionality test of *Dolan* beyond the special context of exactions — land-use decisions conditioning approval of development on the *dedication of property* to public use." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702 (1999) (emphasis added); *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 216 F.3d 764, 772 n.11 (9th Cir. 2000), *aff'd* 535 U.S. 302 (2002) (noting that the *Nollan/*

*Dolan* framework applies to "land-use decisions conditioning approval of development on the dedication of property to public use" and is "inapposite to regulatory takings cases outside [this] context").

**[5]** Applying the general principles underlying the *Nollan/Dolan* and *Penn Central* cases, we hold that Ordinance 1603's requirement that new developments include at least 12-inch storm pipes is subject to review under the *Penn Central* analysis.

**[6]** Similar to *Penn Central*, which addressed whether restrictions imposed by law on the plaintiff's development of a landmark building effected a taking, *see Penn Central*, 438 U.S. at 122, at issue here is whether Ordinance 1603 — which applies to all new developments — effected a taking by requiring the McClungs to install a 12-inch pipe. Ordinance 1603 is akin to the "classic example" recognized by *Penn Central* of zoning laws that generally "do not affect existing uses of real property" but rather affect proposed development, and are upheld where the " 'health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land." *Id.* at 125 (quoting *Nectow v. Cambridge*, 277 U.S. 183, 188 (1928)). That Ordinance 1603 required the McClungs to take the affirmative step of installing a new pipe, as opposed to prohibiting development generally, does not change the analysis. Indeed, Ordinance 1603 is less intrusive than such zoning laws because the McClungs were able to build their Subway sandwich shop after installation of the legislatively-mandated pipe.

Unlike *Nollan* and *Dolan*, the facts of this case involve neither an individual, adjudicative decision, nor the requirement that the McClungs relinquish rights in their real property. Ordinance 1603 was the source of the 12-inch storm pipe requirement, not an adjudicative determination applicable solely to the McClungs. Further, the City already had an easement for the storm pipe such that the McClungs gave up no

rights to their real property. To extend the *Nollan/Dolan* analysis here would subject *any* regulation governing development to higher scrutiny and raise the concern of judicial interference with the exercise of local government police powers. As noted by *San Remo Hotel*, 41 P.3d at 105, any concerns of improper legislative development fees are better kept in check by "ordinary restraints of the democratic political process."

The McClungs make several arguments against application of the *Penn Central* standard, none of which is compelling. First, relying on *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003), the McClungs argue that the requirement that they install a new pipe acted as a monetary exaction and resulted in a per se physical taking of their money, to which *Penn Central* does not apply. *Brown* did not address monetary exactions, and in any event, did not apply the *Nollan/Dolan* analysis to the facts presented. Rather, *Brown* addressed the narrow issue of whether a transfer of interest accrued on an IOLTA account to the Legal Foundation of Washington was an uncompensated taking, and found that it should be analyzed under a per se approach as opposed to the *Penn Central* analysis. *Brown*, 538 U.S. at 235.

**[7]** We further reject the McClungs' characterization of Ordinance 1603 as creating a monetary exaction — it does not require the payment of money in exchange for permit approval. Rather, it provides an across-the-board requirement for all new developments. Even if the upgrade could be viewed as a monetary exaction for the cost of upgrading the storm pipe, however, *Nollan/Dolan* still would not apply. A monetary exaction differs from a land exaction — "[u]nlike real or personal property, money is fungible." *United States v. Sperry Corp.*, 493 U.S. 52, 62 n.9 (1989); *see also San Remo Hotel, L.P. v. S.F. City & County*, 364 F.3d 1088, 1097-98 (9th Cir. 2004), *aff'd* 545 U.S. 323 (2005) (stating that the state court's analysis of the state issues "was thus equivalent to the approach taken in this circuit, which has also rejected

the applicability of *Nollan/Dolan* to monetary exactions such as the ones at issue here"); *Garneau v. City of Seattle*, 147 F.3d 802, 808 (9th Cir. 1998) (upholding a city ordinance that required landlords to pay a $1,000 per tenant relocation assistance fee to low income tenants displaced by the change of use or substantial rehabilitation of a property);[4] *Commercial Builders of N. Cal. v. Sacramento*, 941 F.2d 872, 873-75 (9th Cir. 1991) (rejecting application of *Nollan* to ordinance that conditioned the issuance of nonresidential building permits on the payment of a fee used to assist in financing low-income housing).

Next, the McClungs attempt to recast the facts as involving an individualized, discretionary exaction as opposed to a general requirement imposed through legislation. The McClungs make this argument in recognition of the fact that at least some courts have drawn a distinction between adjudicatory exactions and legislative fees, which have less chance of abuse due to their general application. *See San Remo Hotel*, 41 P.3d at 104 (distinguishing between a fee condition applied to single property that would be subject to *Nollan/Dolan* review and a generally applicable development fee). The facts do not support the McClungs falling within the former category. All new developments must have at least 12-inch storm pipe; there is no evidence on the record that the McClungs were singled out.[5]

---

[4]The main opinion of *Garneau v. City of Seattle*, 147 F.3d 802 (9th Cir. 1998), written by Judge Brunetti, found that the *Nollan/Dolan* analysis did not apply to this permit condition. *Id.* at 808. However, in concurring opinions, Judge O'Scannlain stated that *Nollan/Dolan* should apply, *id.* at 814, while District Judge Williams found that the permit condition should be analyzed under the Due Process Clause instead of the Fifth Amendment. *Id.* at 818. In the end, two of the three *Garneau* judges agreed that *Nollan/Dolan* did not apply to the permit requirement.

[5]The McClungs also argue that Ordinance 1603 does not require a developer to replace non-conforming storm pipe, and even if it did, the requirement is invalid under Revised Code of Washington ("RCW") 82.02.020, which prohibits the City from imposing fees on developments.

**[8]** In sum, we affirm the district court's determination that the *Penn Central* analysis applies to the requirement that the McClungs install a 12-inch storm pipe.**⁶**

2.

In comparison to the 12-inch requirement, the request that the McClungs install a 24-inch pipe was not based on any general regulation applicable to the McClungs, but rather an individualized request. We need not decide whether this factual difference affects whether the *Nollan/Dolan* or *Penn Central* analysis applies, however, because we hold that the McClungs impliedly contracted to install a 24-inch pipe. *See Hewitt v. Joyner*, 940 F.2d 1561, 1565 (9th Cir. 1991) ("It is well-established that this court should avoid adjudication of federal constitutional claims when alternative state grounds are available.").

**[9]** Under Washington law, "[b]efore a court can find the existence of an implied contract in fact, there must be an offer; there must be an acceptance; the acceptance must be in the terms of the offer; it must be communicated to the offeror; there must be a mutual intention to contract; [and] there must be a meeting of the minds of the parties." *Milone & Tucci,*

The district court previously found that Ordinance 1603 "established twelve inches as the minimum pipe size requirement for any new development in the City of Sumner." *Tapps*, 482 F. Supp. 2d at 1228 n.7. The district court also addressed, and granted summary judgment on, the McClungs' state law claim for violation of RCW 82.02.020. *Id.* at 1233. The McClungs did not appeal the district court's grant of summary judgment on the state law claims and did not raise either of these arguments in their Opening Brief. The McClungs are therefore precluded from making this argument.

**⁶**Because the McClungs' appeal is premised on the contention that *Nollan/Dolan* review should apply here — and they have not argued that the City was not entitled to summary judgment if *Penn Central* applied — our conclusion that *Penn Central* provides the proper standard resolves the McClungs' challenge to the City's 12-inch pipe requirement.

*Inc. v. Bona Fide Builders, Inc*., 301 P.2d 759, 762 (Wash. 1956) (internal citation omitted). "[U]nder a unilateral contract, an offer cannot be accepted by promising to perform; rather, the offeree must accept, if at all, by performance, and the contract then becomes executed." *Multicare Med. Ctr. v. Dep't of Social & Health Servs*., 790 P.2d 124, 131 (Wash. 1990). The City has the burden to "prove each essential fact [of a contract], including the existence of a mutual intention." *Cahn v. Foster & Marshall, Inc*., 658 P.2d 42, 43 (Wash. App. 1983); *see also Bogle & Gates, P.L.L.C. v. Zapel*, 90 P.3d 703, 705 (Wash. App. 2004).

**[10]** In its December 27, 1995 letter, the City offered to waive certain permit fees in exchange for the McClungs' installation of a 24-inch storm pipe:

> As a developer, you are required to install a 12-inch storm drain as a minimum. My estimate shows the cost difference between a 12-inch and a 24-inch diameter pipe ranges from $7,200 to $7,500. To offset the cost of the oversizing to meet the City's Comprehensive Plan requirements, the City will waive the storm drainage General Facilities Charge, permit fees, plan review and inspection charges of the storm drainage systems for both the development and the Subway Shop. . . . *If you find this acceptable, please proceed with the revisions to the Plans.*

(emphasis added). This letter provides the McClungs the choice of either agreeing to install a 12-inch pipe and pay the usual fees, or install a 24-inch pipe and receive the fee waiver. The McClungs accepted the latter option by revising their development plans and installing a 24-inch pipe. Thus, the McClungs impliedly contracted to install the 24-inch pipe.

**[11]** None of the McClungs' arguments against the existence of a contract has merit. First, the McClungs argue that installing the 24-inch pipe was a mandatory requirement. The

plain language of the December 27, 1995 letter clearly shows otherwise. Second, the McClungs claim that they did not understand the letter as an offer. Their subjective intent, however, is irrelevant where their objective actions indicate acceptance of the offer. *See City of Everett v. Sumstad's Estate*, 631 P.2d 366, 367 (Wash. 1981) (stating that Washington follows the "objective manifestation theory of contracts"). Third, the McClungs argue that for there to be an implied contract, it would have to cover the entire upgrade from 6-inch to 24-inch pipe because the 6-inch to 12-inch requirement was illegal and/or contrary to *Nollan/Dolan*. As discussed above, *Nollan/Dolan* does not apply, and the district court rejected their state law claims. Finally, the McClungs argue that the City misrepresented its authority and the McClungs acted under compulsion. There is absolutely no legal or factual support for these arguments, and we reject this claim out of hand. Because the McClungs were not compelled to install a 24-inch pipe, but voluntarily contracted with the City to do so, there was simply no "taking" by the City.

## IV.

We hold that the district court properly determined that the *Penn Central* standard applies to the City's requirement that the McClungs install a storm pipe at least 12 inches in diameter, and that the McClungs impliedly contracted to install a 24-inch pipe.

**AFFIRMED.**